*Harlan & Craddock* for appellant: *B. & A. Monroe* for appellee.

Cincinnati In-surance Co. &c.
vs
Bakewell, &c.

---

# Cincinnati Insurance Company and Ohio Insurance Company *vs* Bakewell and Farrow.

### Error to the Louisville Chancery Court.

*Insurance. Total loss. Abatement. Salvage.*

Judge Marshall delivered the opinion of the Court.

The original bill, in this case, was filed by Bakewell, to attach the steam boat, Athenean, then in the port of Louisville, as the property of his non-resident debtor, Farrow, and to subject it to the payment of his debt. By an amended bill, suggesting that the Cincinnati Insurance Company and the Ohio Insurance Company pretended some claim to the boat, they were made defendants, and in their answer they claim a lien on the boat, which they say was in possession of their agent when attached.

They say that they had, by two separate policies, executed by them respectively, to Farrow, insured the said boat for six months, to the amount of $5000 in each policy,

Chancery.

Case 108.

June 10.

The allegations and object of the original and a-mended bills.

CINCINNATI IN-
SURANCE CO. &c.
vs
BAKEWELL, &c.

against total loss only, the boat being valued in each pol·
icy at $18,000; that within the six months, (on the 29th
of April, 1839,) the boat was partially sunk, in naviga-
ting the Ohio river, and Farrow offered to abandon her
to them as for a total loss, but they believing she could
be raised and repaired for less than half of her valuation,
refused to accept, and afterwards raised her, &c. as sal-
vors merely; that in doing so they have expended about
$1800, for which they have a lien, and that they are ad·
vised they are entitled to one half the property saved, for
which they have a lien, and they pray that the boat be
sold and their claim first satisfied. Their answer is made
a cross bill against Bakewell and Farrow, who, in their
answers, resist the claim set up for salvage, and insist
that the boat was not partially but wholly sunk and lost;
that the abandonment was valid; and that the insurers
took possession under it, and are liable, upon their pol-
icies, for a total loss, in part discharge of which liabili·
ty, Bakewell prays that they be decreed to pay his de-
mand against Farrow, to which the latter assents.

*The answer of
Bakewell and
Farrow, the lat-
ter made a cross
bill vs. plaintiffs
in error and their
answers thereto.*

Farrow makes his answer to the cross bill of the Insur-
ance Companies a cross bill against them, and states,
among other steps taken by him in relation to the loss
and abandonment, that he had presented to the two In-
surance Companies, in Cincinnati, a statement of the ac-
cident contained in the protest, &c. and requested their
aid in relieving the boat, but that this request, being
treated with contempt, he abandoned to them, on the 1st
of May.

Without responding to this allegation the Companies
maintain their original ground and deny that there ever
was a total loss or acceptance of the abandonment.

It appears from the pleadings that there had been some
negotiation between Farrow and the Insurance Compa·
nies for a restoration of the boat, on his paying or secur·
ing the amount paid by them for raising and repairing
her. But if any terms were actually agreed on, they are
stated differently by the parties, and in the absence of
proof it can only be said that the negotiation failed, or
that before any thing was done or concluded on, the boat
was attached by Bakewell, as the property of Farrow,

which, as the evidence conduces to show, was done at his suggestion and desire.

CINCINNATI INSURANCE CO. &c.
vs
BAKEWELL, &c.

The policies appear to be such as are stated by the Insurance Companies, insuring against total loss only, and, therefore, not authorizing a recovery for any partial loss. But by an established principle of the law of insurance, the justice of which, in cases of insurance against total loss only, is, we believe, scarcely denied, even by those who dispute its propriety in other cases, the insured is allowed, under certain circumstances of injury and loss and danger, occasioned by one of the perils insured against, to free himself from further risk by abandoning his interest in the subject insured, to the insurer, and by thus casting the ownership, with its chances, upon him, to entitle himself to recover as for a total loss, and in effect to make a loss total, which, upon the facts actually constituting the injury, would have been partial only. This being the effect of an abandonment when made under circumstances absolutely authorizing it, the acceptance of an abandonment, offered under circumstances even of doubt as to the positive right, should have a like effect, since such acceptance not only implies an admission of the right of abandonment in the case, but is in truth the assumption of that attitude, with regard to the property which is the consequence of abandonment, and the ground of liability, and which, in fact, makes the loss total to the insured.

When the insurance is against total loss, the insured, under certain circumstances, occasioned by one of the perils insured against, may abandon all interest in the subject insured to the insurers.

The acceptance upon an abandonment implies the right to abandon, and renders the insurer liable as for a total loss.

The Chancellor, in an able and learned opinion, maintains that there was both a valid abandonment, justified by the circumstances, and also an acceptance, whereby any deficiency in the circumstances was supplied, and deciding that on both or one of these grounds, the insurers became at once liable for a total loss, and invested with the property in the boat, which, under his order, had been sold at public auction during the pendency of the suit, for the sum of $5000—decreed against each of them the principal and interest due upon the policy executed by it, after making such deductions as the policy itself required, and decreed to them the net proceeds of the sale of the boat, after charging thereon the costs and

The decree of the Chancellor.

charges of the sale and of keeping her, under the attachment, amounting in the aggregate to upwards of $1200.

To reverse this decree the two Insurance Companies, which have acted jointly throughout, prosecute a writ of error, complaining, by their assignment of errors, that they were improperly made liable for a total loss; that their character and claim as salvors was improperly denied, and that they were improperly subjected to the entire burden of the costs and charges occasioned by the attachment of the boat. And Farrow, by his cross assignment of errors, complains, among other things, that he was not allowed the claim set up in his answer, to eight-eighteenths of the net amount of the sale of the boat, after paying expenses, that being the proportion of the boat which was uninsured according to the valuation in each of the policies. Other cross errors are also separately assigned and insisted on by Farrow and Bakewell, but as they are unconnected with the principal questions in the case, and relate to matters not affected by the insurance law, and in which the insurers have no interest, they need not be stated in this place.

The claim of Farrow to a rateable interest in the net proceeds of the sale, proportioned to the uninsured part of the boat's agreed value in the policies, as it could only be made in that shape, on the ground that the abandonment was effectual, so it is, in our opinion, precluded by the same fact, upon the principle that an abandonment, legally made, puts the underwriters completely in the place of the assured, and operates, in effect, a transfer of property: *Chesapeake Insurance Company* vs *Stark,* (6 *Cranch,* 272; *Col. Insurance Company* vs *Ashby, &c.* (4 *Peters' S. C. Rep.* 144,) &c. &c. And on this principle, with regard to which we have seen no contrariety of opinion or authority, the claim was rejected by the Chancellor. We may add without deciding that such a claim would not, under any circumstances, be admissible, that as it is optional with the insured, even when he has the undoubted right of abandonment, either to retain the property and seek his indemnity in what may be saved by himself and in his remedy, if he has one, for a partial loss, or by abandoning the property to secure a

An abandonment
legally made,
puts the insurer
in the place of
the assured, and
transfers the
right of property
in the thing in-
sured.

recovery for a total loss, leaving to the underwriter the chance of indemnity by saving what he can at his own risk and expense, there is at least no equity in allowing the insured after such abandonment, to come in for any share of what may be saved, while the underwriter is not indemnified. If the abandonment in this case was neither effectual in itself nor made so by acceptance, the entire boat and its proceeds, subject to such expenses for salvage, &c. as properly attached to it, belonged to the insured. The right of the insurers to interpose as sal-vors merely, is also necessarily involved in the considera-tion of the question of abandonment and acceptance, and either determines or is determined by it.

We proceed then to the abandonment, which having been made or offered in writing on the first of May, in the city of Cincinnati, only two days after the accident had happened, a considerable distance above that city, is liable to no objection in point of form, or as having been too late. It is indeed objected that the abandonment was made too soon, and before there had been either sufficient exertions to relieve the boat, or a sufficient op-portunity for judging of its condition. But as the boat having run over a log in the proper navigation of the river, whereby her bottom was so injured, and the water was let in so freely that she would have sunk immediately in the middle of the river, if she had not been put to the shore, and as great exertions were made to keep her up until she was got to the shore, by pumping and other-wise, and to haul her into the shore as far as possible, both bow and stern, and as she was in fact put in as secure a condition as she could be put in, being fastened to the shore with her keel on the bottom and her bow and stern out of water, we think it apparent that there was no want of honest effort at the time, to secure the boat from future injury and to limit, as far as possible, the evil con-sequences of the accident. And as it is, moreover, ap-parent that the boat could not be relieved or repaired by the crew; that there was no competent assistance imme-diately at hand or probably nearer than Cincinnati, and none to be had any where without such pecuniary means as may be assumed not to have been in the power of Far-

row, who was the Captain or Master as well as the owner, and as it is certain that no fortunate accident could have raised the boat and put her either in a state of repair or in a condition to be repaired, while delay might have increased the amount of injury as well as the difficulty of relieving the boat, we cannot think that Farrow was in too great haste either in requesting aid from the insurers, or upon their refusal, in abandoning the boat to them, if in other respects the circumstances authorized an abandonment.

Did the circumstances then justify an abandonment of the vessel when it was offered on the first of May? Upon this question we have great difficulty, not only on account of its novelty as a question relating to the navigation of the Ohio river, but also on account of the extreme paucity of facts and estimates from which to draw any satisfactory conclusion upon the question stated. We have already detailed the material facts with regard to the accident, and the immediate injury and consequent condition of the boat when Farrow left her, so far as they are shown by any evidence on the part of the insured, except that in the protest which contains all the evidence on the subject, which has been offered on that side. Farrow, as master and owner, states that he could not discover where the boat leaked or was injured. On the other side, the insurers alledge, in support of their claim for salvage, that the condition of the boat was very perilous, and that but for their intervention she would have been lost. And they prove by two of their agents who had been concerned in raising her, and who saw her at least as early as the 4th of May, that she was much injured in the bottom, to the extent of seventy feet; that her plank and timbers were shivered; that the water was up to the letters on the wheel house and two and a half feet deep on her main deck; that it required great skill to raise her and could not have been done but by persons of experience, and that they saw Farrow as they were going up to the boat, who told them it was useless to attempt to raise her, for he was a boat builder and if he could not do it no body could. It also appears by a letter of one of these agents, written on the 4th of May, that the river was then rising,

but was expected soon to fall again, when operations for raising the boat were to commence. And it is certain that the boat was in fact raised, and had received considerable if not complete repairs at the distant port of Louisville, before the end of May, and at a cost of about $1800.

There is no question that the injury and its consequences arose from one of the perils insured against, and thus far the case comes within the policy. But was there a total loss, actual or constructive? It is said that to authorize an abandonment there must be, at some period of the voyage, (and we suppose at the time of the abandonment or at least of the last previous intelligence,) a total loss, actual or constructive. The English doctrine seems to be that to authorize a recovery for a total loss on the ground of abandonment, the loss must have continued total in substance. But the settled doctrine in the United States is, that if the abandonment be justified by the facts at the time, the rights of the parties are fixed and will not be changed by subsequent events independently of their own acts or consent. There seems to be some discrepancy too as to the question of what constitutes a total loss, which will justify abandonment.

But without tracing or attempting to reconcile this discrepancy, it is sufficient to say that the doctrine is well settled in the United States, that when by one of the perils insured against, a vessel is so injured or placed in such a condition as that she cannot be relieved and repaired, (that is, made as good as she was before the accident,) but at an expense exceeding half her value, (to be ascertained, as some Judges have said, after she is repaired, and at the place of repair,) the owner may abandon. This has been recognized and acted on as the general rule in many adjudged cases: *Hart* vs *Del. Ins. Com.* (2 *W. C. C. R.* 349;) *Ritchie* vs *U. S. Ins. Com.* (5 *Serg. & Rawle,* 509;) *Peele* vs *Merch. Ins. Com.* (3 *Mason,* 27;) *Same* vs *Suffolk Ins. Com.* (7 *Pickering,* 254;) *Woods* vs *L. & K. Ins. Com.* (6 *Mass. Rep.* 482;) and the same doctrine is recognized in the Courts of New York.

CINCINNATI IN-
SURANCE CO. &c.
vs
BAKEWELL, &c.

If the circumstances at the time of abandonment justify the rights of the parties are fixed and will not be changed by subsequent events.

In the U. S. it is settled that if the expense of repairs of an injury within the policy, exceed half the value of the vessel insured, the insured may abandon as for total loss.

Cincinnati In-
surance Co. &c.
   vs
Bakewell, &c.

In the case of *Wood* vs *L. & K. Ins. Com.* (6 *Mass. Rep.* 482,) it is laid down that "when a ship becomes a wreck by any of the perils insured against, it is generally a total loss, and the owner may abandon." Of the correctness of this principle there cannot be a doubt. Wreck is one of the principal dangers against which an indemnity is sought by obtaining insurance, and it is especially a principal object of insurance in the peaceful navigation of our inland rivers. At sea it must be in most cases an actual total loss. But still the word shipwreck would be extremely indefinite as a description of the condition in which a boat must be on the shores or bars of the Ohio river, in order to constitute a total loss. And while there is no difficulty in saying that a boat in such or such a condition would certainly be a wreck and a total loss, there might be great and indeed insuperable difficulty in stating, in terms descriptive of the physical condition of the boat, the least amount of injury or of distress arising from its situation, that would make it a wreck and a total loss. In the case last cited, the Court go on to state, when a ship is a wreck not by describing its actual condition, but by reference to a criterion which is as intelligible in its application to boats on the Ohio as to vessels on the ocean: "A ship becomes a wreck, (say the Court,) when in consequence of the injury she has received she is rendered absolutely innavigable, or unable to pursue her voyage, without repairs exceeding half her value;" thus bringing us back to the general test of the right of abandonment which has been before stated.

But is the right of abandonment, as dependent upon this criterion, to be determined by actual experiment alone? If so, the rule would indeed be sufficiently certain, but it would, in many cases, defeat altogether the right of abandonment for a loss not in fact total; for at whose cost shall the experiment be made? If where the recovery for a total loss depends upon a valid abandonment, such abandonment cannot be made, or if made, cannot be sustained except by an actual experiment demonstrating that the vessel cannot be got up from the bottom, if sunk, or got off the shore if stranded, and repaired for half her value, the insurer could not be compelled

to make the experiment at his own expense, and he would be the more unwilling to do it in proportion as the probability would be greater that the vessel could not be relieved and repaired for half her value—that is, the stronger the case might be for an abandonment, the less likely would the insurer be to furnish the proof necessary to sustain an abandonment; and the st ronger the case should be for an abandonment, the less justice there would be in requiring the insured to expend his money in an experiment which, so far as the restoration of the vessel was concerned, might be entirely unsuccessful. In which case, as he could not recover from the insurer more than a total loss or the total value insured, the cost of the experiment would be fruitlessly and irrecoverably lost. Since then the actual experiment is not in general necessary for ascertaining with reasonable certainty the probable cost and result of the undertaking, why should the actual experiment be the only means of proving it? Men adopt the most important resolutions; undertake or abandon the most important enterprises upon such estimates of the probable cost and result as experience and observation can furnish; and facts upon which the most important interests depend, are constantly determined upon such probable inferences as satisfy a reasonable mind. Why then may not the question as to the cost of relieving and repairing a vessel on which the right of abandonment depends, be determined by such proof, and why should not the propriety of its exercise be judged of and decided in reference to such an estimate of probabilities as prudent and discreet men are accustomed to act upon? As the insured owner is bound, in case of misfortune, to determine at once in reasonable time, whether he will continue the adventure, and therefore repair for his own benefit, or will abandon and seek indemnity from the insurer as for a total loss, and as in fact his proceeding to repair will, unless under very peculiar circumstances, be regarded as a conclusive election to continue the adventure and seek such indemnity as he may for his partial loss, it would seem necessarily to follow, that if his right of abandonment is to be available at all, he must exercise it upon a fair view of all the circumstances af-

fecting the question of the practicability and probable cost of relieving and repairing the vessel, and that the propriety of his determination and its consequences, must be finally judged of and decided in reference to the same considerations, no matter what may be the result of an actual experiment which may be made by others, unless it be said that the underwriter may, under the abandonment, make the experiment at his own expense, with the right of tendering the restored vessel in discharge of his liability. Waiving for the present, any question as to this condition, in regard to which eminent jurists differ in opinion, and as to the terms of which there is not a perfect agreement among those who recognize the propriety of some such condition, we pursue the inquiry as to the mode of ascertaining the facts on which the right of abandonment depends, and by which it is, in general, to be decided.

The insured may lawfully abandon when from a fair view of all the circumstances, the costs of repair would justify such abandonment.

In the case last referred to in 6 *Mass. Rep.* 483, the Court say, if the ship be stranded where the means of relief and repair are at hand, "but it may be doubtful whether the attempt to get her off will succeed, while the expense is certain, if the insurer will not engage to pay the expenses of the attempt, the assured may abandon; for in this case, as he cannot recover more than a total loss, he should not be holden to labor for the recovery of the ship, which he must do at his own expense, if he should be unsuccessful." Then according to this position, the extreme improbability or even the real doubtfulness of succeeding in the attempt of getting off the vessel, will, in the absence of any offer or consent of the underwriter to bear the expense, excuse the owner from making the attempt and justify an abandonment. And as the case does not intimate that after an abandonment, thus justifiable, the underwriter will have the right to repair for the benefit of the owner; it is not inconsistent with it to say that whatever may be the result of any such subsequent experiment by the underwriter, the abandonment would finally be sustained by the same circumstances which justified it when it was made. In *Peele* vs *Merch. Ins. Com.* (3 *Mason*, 27,) Judge Story expressly reserves his judgment as to the question whether

the right of abandonment, as dependent upon the expense of relieving and repairing the vessel, is to be judged of by the event. But in the case of *Bradlie et al.* vs *The Maryland Insurance Company,* (12 *Peters,* 397,) the Supreme Court, in an opinion delivered by the same Judge, decide, that though the cost of repairs, &c. when actually made, should be less than half the value of the vessel when repaired, this is not a certain proof against the right of abandonment; that the state of the vessel, the imminency of the peril, and the apparent cost of repairs may be such at the time as to justify an abandonment, though by a fortunate event she may be relieved from peril, and afterwards be repaired without such expense. And it has been decided in other cases, that if the situation of the vessel was desperate, an abandonment might be justified though the vessel may, in fact, have been got off by other persons and repaired at an expense of less than half the value: *Fontaine* vs *Phœnix Ins. Com.* (11 *Johns. Rep.* 293.)

If then it could be assumed that the boat was relieved and put into a complete state of repair, by which she was made as good as before the accident, at a cost of less than half of her value after the repairs were made, this would not be a conclusive proof against the abandonment; if it were shown on the other side, that the situation of the boat was apparently desperate; that it was doubtful whether she could be got off at all; or that it was extremely improbable, from the imminency of the dangers by which she was threatened, and from the nature of the injury, and the apparent cost of the attempt, that she could be got off and repaired for half her value. But while on the one side the proof, as drawn from the event, fails of being absolutely conclusive, because it is not shown that the boat was in fact completely repaired, the proof also fails, on the other hand, to show either that the boat was in such a state of extreme peril as to make it really doubtful whether she could be got off in a condition to be repaired, or that, upon a reasonable calculation of the expense of getting her off and repairing her, the cost would exceed half her value.

The description given of the actual injury to the boat will not do. For we know that broken planks and timbers have been, and in general can be replaced, and neither any opinion to the contrary nor any estimate of expenses is given by any witness. The expressions too, "that the boat was in a very perilous condition, and that it required great skill and experience to raise her," are too vague to convey any satisfactory information, or to form the basis of a decision. It is not shown that disinterested men of skill and experience really doubted as to the practicability of raising and repairing her in reasonable time and at a reasonable expense. It is not stated in what the impending perils consisted. It is not stated that she was in the way of drift wood, or that there was any danger of her being washed off from the shore in despite of reasonable efforts. And although the difficulty of raising her might be increased by sediment from the muddy water running over her, it is not said that there was any probability of its becoming impracticable to get her up, from this cause, or that there was any other danger from the water.

In fine, although the river is known to be usually high and fluctuating in April and May, and although it may have been rising when the accident happened, as it was on the 4th of May, yet we cannot regard its subsequent fall as a mere accident which enabled the insurers, unexpectedly, to raise the boat. It is not shown that there was any thing out of the usual course in the fluctuations of the stream, as to height, in that season. And in truth it is not shown that there is any thing to distinguish this from other cases of boats sinking at the shore of the Ohio, and which are got up and repaired in a short time, and at an expense which justifies their continuance in business. We are not prepared, therefore, to decide, and especially upon the face of the protest on which the abandonment was made, that from the extent of the injury, the condition of the boat at the time, the doubtfulness or improbability of raising her, or the probable cost of raising and repairing, the owner had an absolute right to abandon her, even upon the refusal of the insurers to assist him with funds. For the insurers were under no ob-

ligation to repair partial injuries or indemnify against partial loss, nor to aid the insured to prevent any partial loss.

Upon the facts appearing in the protest, which was the only evidence before them, and by which their action at that time was to be determined, we cannot say that there was any real ground either for doubting the practicability of getting the boat off in reasonable time, or for supposing that she could not be raised and repaired at an expense of less than half her value. The insurers, therefore, who were not responsible for any consequences which might ensue from the mere neglect or delay of the insured to take measures for the relief of the boat, but only for the proper consequences of the accident, had, apparently, no interest in the subject, and did not increase their own responsibility by refusing assistance which would only be due under circumstances which rendered probable a loss for which they would be responsible. The case does not, in principle, come up to that stated in 6 *Mass. Rep.* as above cited, for the want of that doubt as to the practicability of saving the boat, which would have made the insurers interested in her condition, and we are not sure that the absence of that interest which arises from a liability for partial losses is not of itself a sufficient ground for discriminating between this case and all of those in which effect is given to the insurers refusal to aid in the relief and repair of the vessel.

But although the abandonment, or the offer to abandon, being refused at the time, did not, *ipso facto*, change the property and make the loss total, it might afterwards be made effectual for these purposes, if persisted in on the one side, as it certainly was, and expressly or impliedly accepted on the other.

Tho' it may be doubtful whether the facts proved did justify an abandonment of a vessel, yet if it be persisted in by the insured, and expressly or impliedly accepted by the insurer, the facts authorizing a recovery will be held as for a total loss.

It appears then, that while Farrow actually adhered to his offered abandonment, by leaving the boat to her fate, the insurers sent up their agents, determined to make the attempt to relieve and repair her, and 'that, having taken possession of her and succeeded in the attempt, they never, in fact, offered or were willing to restore her but upon the terms of being remunerated for their expenses,

and that they finally claimed, as salvors, one half of what
was saved? What then is the proper effect of these
facts? Why did the insurers interfere after having refused
to aid the owner in relieving the boat? By what right did
they take possession of the boat and raise and repair her?
And for whose benefit did they do these things?

It appears that their agents apprised Farrow, on their
way up to the boat, that they were going for the purpose
either of attempting to relieve her or at least of deter-
mining whether such an attempt might be undertaken
with a prospect of successs. But their meeting with him
seems to have been casual; and it does not appear that
the insurers ever communicated with him designedly, be-
fore they had raised the boat, or that he was in any way
apprised of the motives of their conduct or of the char-
acter in which they acted, except as he might infer it from
the fact that he had abandoned the boat to them under
circumstances which, as he believed, authorized that act.
They did not tell him that they would raise the boat for
him at their own expense, nor even that they would re-
store her upon his paying or securing the cost, if it should
be less than half her value, nor that they were acting as
common salvors. He had a right to infer, and such is
the fair deduction from the facts, that they were sending
up their agents to determine, upon actual examination,
what was the true condition of the boat as to actual inju-
ry and impending danger, and that they were doing this
with a view to the course which it was proper for them to
take, as insurers to whom the boat had been abandoned
as a total loss. They had already shown that they were
not disposed to interfere in aid of Farrow, further than
they were interested in doing so. As insurers their rights
did not extend beyond their liabilities, and they were un-
der no liability unless the boat was either totally lost or
in such a situation as to authorize the abandonment, or
unless they accepted the abandonment. They had,
therefore, no right, as insurers, to take possession of the
boat, or to interfere with her, except on one of these
grounds, which may all be resolved into the last, or for
the mere purpose of ascertaining the facts. And we think
it clear that it was in the character of insurers, and no

other, and in virtue of the abandonment and by no other right that they did act.

They claim, in their answers, to have been common salvors, entitled to half the property saved. The Chancellor has rebuked, in appropriate terms of indignation, a claim so inconsistent with the relation which, by their contract, they had assumed towards the boat and her owner. But if, in any case, insurers might so far depart from their ordinary character and the duties and relations belonging to insurers, as to claim against the insured, to act as common salvors of a vessel insured by themselves, it must surely be a case in which other persons who were under no such relation might act as salvors. But would any common salvor or wrecker, who should see a boat well fastened to the shore of the Ohio, be at liberty to take possession of her, because she was lying on the sand with the water over her deck? Would he not see that she was not entirely deserted, but that the right of property and dominion over her was still retained by some one, with the intention of resuming the actual possession? Besides, it appears that, though the boat was not inhabitable, some of the crew still remained near her, and if any common passer by could have imagined that he had a right to take possession as salvor, his mistake would have at once been corrected by information that the boat had been abandoned, not to the world but to the underwriters.

It was then in virtue of their character and liability as insurers, and in virtue of an admitted case of total loss, or of the offered abandonment, that they had a right to take possession, and they saved the boat for themselves alone, unless it can be clearly established that they had the right, though coming in under these circumstances, to make the experiment of raising and repairing her, reserving, tacitly, the privilege of restoring her to the owner and charging him with the cost, if it should not exceed half her value. And it is upon this ground, as we presume, and not upon the flagrantly unjust claim of one-half, for salvage, that the insurers desire to place themselves in their answer.

But we do not find, in any adjudged case or elementary treatise on this branch of the law of insurance, nor in any view which we can take of the rights of the parties, upon the facts, any principle on which such a privilege can be established.

On general principles of policy and good faith, fully recognized in the law of insurance, each party, in case of loss and abandonment, is required to act promptly, in such reasonable time as may suffice for the ascertainment of the existing facts, and neither is allowed to suspend his own action or the rights of the other, with the view of speculating on subsequent events, at the expense of the other party. There are cases, it is true, which decide that the insurer may, in case even of a justifiable offer to abandon, intercept the abandonment, and in effect suspend the right of the insured, by agreeing to relieve the vessel and repair the damage at his own expense, as in the cases already referred to in 5 *Sergeant and Rawle*, 509; 2 *Wash. C. C. R.* 349; and in the cases cited from 6 *Mass. Rep.* the right of abandonment, under some circumstances, is made to depend in conformity with what was said by Lord Mansfield in *Miller* vs *Fletcher*, (*Douglass*, 219,) upon the additional fact of the insurer's having offered or refused to incur such expense. These cases all imply that the right of thus suspending the abandonment results from an offer or agreement, by the insurer, to incur the expense though it should exceed his liability, and do not recognize any right in the insurer, without such previous offer or agreement to take possession of the vessel, after an abandonment actually offered, and repair her, even at his own expense, with the privilege of restoring her in discharge of his liability. And if the existence of such a right is intimated in the case of *Peel* vs *Suff. In. Co.* (7 *Pickering*, 257,) which is not entirely clear, the intimation which is accompanied with the acknowledgment that the right is not unquestioned, goes beyond any other cases. Even the right of intercepting the abandonment by an offer to repair, at the insurers expense, is denied by Chancellor Kent, in his Commentaries, and by Judge Story, in the case of *Peel* vs *Merch. In. Co.* (3 *Mason.*) The last case also explicitly denies

the right, except as growing out of a timely offer, and determines that the offer made a week after the abandonment, which was followed by the actual repair of the vessel, was too late. And in the case of *Coll. In. Co.* vs *Ashby, &c.* (4 *Peters*, 145,) the Supreme Court, in an opinion delivered by Judge Thompson, waiving the question as to the effect of an unconditional offer, made before the abandonment, decides peremptorily, that an offer to repair, made after the abandonment, was ineffectual, as being too late and as being accompanied with an express reservation of the right to contest the insurers liability for any part of the expenses.

It is plain then that the privilege now in question goes far beyond any that is recognized in either of the cases, and finds no countenance in any of them. The insurers, after a peremptory abandonment by Farrow, after due ascertainment and consideration of the facts by their own agents, and after having treated with contempt the request for aid, have in Farrow's absence, without communication with him; without offer, agreement or negotiation with respect to the object and terms of their interference; without avowing at the time that they were acting for his benefit and at his expense, taken possession of the boat and proceeded to repair her, and without even in their answer claiming that they acted with the view of testing the right of abandonment or of restoring the boat, either with or without a reimbursement of their actual expenditures, deny that they ever accepted the abandonment, and to avoid the inference growing out of their conduct, that they acted solely in virtue of the right conferred by the abandonment, they profess that they acted as salvors merely, and set up claim to one half of what was saved, as due to them in that character. They did not profess that character when they took possession of the boat, and its assumption now will not avail to defeat the inferences and avoid the responsibility arising from their acts.

They took possession of the boat under and in virtue of the abandonment; they raised and proceeded to repair her either under the opinion that the abandonment was justifiable, and for the purpose of diminishing their loss, if

Insurers taking
possession of a
boat abandoned
by the insured,
without any de-
signation as to

CINCINNATI IN-
SURANCE CO. &C.
    vs
BAKEWELL, &C.

the object, will be
presumed to have
done so as insur-
ers only.

the boat could be repaired, and if Farrow would receive her voluntarily or could be compelled to take her, or under the opinion that the case was doubtful as to the right of abandonment, and that they might test its propriety by actual experiment, with the right of throwing the expense upon Farrow, if it should not exceed half her value, or at any rate with the prospect and purpose of making what advantage they could by the result. We reject the hypothesis that, being satisfied that the case did not justify the abandonment, and that they were, therefore, clearly free from liability, they acted merely with a view of aiding Farrow, by advancing the funds necessary for the occasion, and restoring the boat, upon his assurance of reimbursement; because this is not only inconsistent with their previous refusal, but they have not alledged that such was the fact, and because, if they were satisfied that there was no total loss, they had no pretext of right or motive for retaining any further control or possession of the boat. As salvors, they had no right to repair her—as insurers they had no rights beyond their liabilities, except such as were conferred by the acts or consent of the insured—and as they took and retained the possession and control of the boat under the abandonment, without qualification or reservation, or other agreement than that which is to be implied from connecting this conduct on their part with the previous abandonment, we think their acts necessarily imply and constitute an acceptance of the abandonment and consequent liability for a total loss, from which they could only be relieved by subsequent arrangement.

They never restored the boat to Farrow; never offered to do it, and never were willing to do it but upon the condition, which they had no right to impose, that their expenses should be repaid or secured to them. And although Farrow, who seems to have been reduced to insolvency by this loss or otherwise, was willing, under threats of suit, as he says, to get back the boat, even on this condition, he was unable to pay, and the parties did not agree as to the terms of the lien on the boat, by which alone, he could secure the demand. And altho' the conduct of Farrow, in inducing Bakewell to attach

the boat, as his, and his expressions in reference to that subject may imply the opinion on his part that the ownership was in him, yet this opinion may have grown out of his understanding of the state of the negotiation with the insurers, or out of his supposed right to a portion of what was saved, and even if it did not, his mistake as to the legal effect of the facts did not make him the owner of the boat.

We are of opinion, therefore, that the insurers must be deemed to have accepted the abandonment, and that by having taken unconditional possession of the boat, and retaining her and claiming to keep her but on conditions which they had no right to impose, they became liable for a total loss, and were in fact the proprietors of the boat when the attachment was levied on her in their possession. They were of course entitled to the proceeds of the sale.

The only remaining question, therefore, as to the propriety of the decree, under the objections made to it by them, relates to the charges for keeping and selling the boat under the attachment.

These charges were thrown entirely upon the insurers, on the ground, as stated in the opinion of the Chancellor, that they had given Bakewell probable cause to attach the boat, as the property of Farrow, and that by their conduct in holding out a false and feigned claim to one half of the boat, as salvors, to excuse themselves from paying the insurance, and inducing the creditors of Farrow to believe that he owned the boat, subject to that claim, when they well knew that he had abandoned the boat to them, and that they had taken possession of her, and by levying their own attachment, (for the premium notes,) they were, in equity, subject to said deduction. There is much apparent force in these reasons, and were it not that the particular attachment, at the suit of Bakewell, which was the first, and is the only one before us, seems to have been attributable, in part at least, to the conduct of Farrow, as well as of the insurers, we should yield unhesitating assent to it. And as a part of the expense seems to have been incurred for repairs to the boat while in the custody of the Marshal, their portion, at least, as well as

CINCINNATI IN-
SURANCE CO. &c.
*vs*
BAKEWELL, &c.

the cost of sale should properly fall on the proprietors of the boat and be deducted from the proceeds of the sale. But it seems to us that as Farrow, as well as the insurers, was in fault in inducing Bakewell to have the attachment levied on the boat as his property, the ordinary expenses consequent upon that, being the officer's charges for keeping the boat, should be equally divided between them, and consequently the decree must be deemed erroneous so far as it departs from this principle.

A party may not assign cross errors though existing between other parties to the same suit, unless he is prejudiced by such error.

The only cross error assigned by Farrow, in addition to that which has been already disposed of, is that the decree in favor of Bakewell should have been against both of the Insurance Companies, instead of being against the Cincinnati Insurance Company only. But this is a matter in which Farrow and Bakewell are alone interested, which cannot, therefore, be assigned as a cross error against the plaintiffs in the writ of error, and of which, if it may be assigned as a cross error at all in the case, it would seem that Farrow had no right to complain although Bakewell might. Farrow cannot object that his creditor is made secure of his debt.

The cross errors assigned by Bakewell are, that enough is not decreed to him, and that interest at least should have been allowed on his claim. It may be doubted whether the plaintiffs in error have any interest in the question of the amount decreed to Bakewell, since it does not affect the amount decreed against them, but only affects the question, how much of that amount shall be paid to Bakewell and how much to Farrow, and as a question between them alone, it may not perhaps be the proper subject of a cross assignment upon a writ of error in which they are joint defendants. But waiving this objection, we remark that this is a case in which the Chancellor was not bound to give interest, and we are not disposed to interfere with his discretion as exercised in the decree. And with regard to the amount decreed to Bakewell, as it is much greater than the sum claimed in his original bill, and as the amended bill, in which he professes to have ascertained the amount due, does not state it but merely refers to vouchers which, exclusive of inter-

est, do not establish more than was decreed, we think there is no ground of reversal in behalf of Bakewell.

Wherefore the decree is affirmed, except so far as it subjects the *two* Insurance Companies to the entire costs and charges incurred with respect to the boat, in consequence of the attachment, and as to that matter, the cause is remanded with directions to render a decree as above indicated.

*Pirtle* for plaintiffs; *Duncan, Browne, Fry & Page, and Loughborough* for defendants.