JAMES L. MARMAUD *vs.* JAMES P. MELLEDGE & others.

Suffolk. March 13, 1876. — Sept. 29, 1877. AMES, MORTON & SOULE, JJ., absent.

If an insurer refuses to accept an abandonment of a stranded vessel, but takes possession for the purpose of getting her off, repairing and restoring her to the owner, and, in good faith and with reasonable diligence, proceeds to make what he deems full repairs, at a cost less than half her value when repaired, after making the usual deductions, and tenders her in this condition to her owner, who refuses to receive her, but makes no objection to the sufficiency of the repairs, and points out no deficiencies, there is no acceptance of the abandonment, and no constructive total loss of the vessel, although it afterwards appears that the repairs were not fully made.

A vessel was chartered to proceed to a certain port " with all convenient speed," and there take a cargo on board and transport it to another port. Her owner effected insurance on the freight. The vessel, while on her way to the port of lading, was stranded and abandoned to her underwriters, and an abandonment was also made to the underwriters on the freight. The underwriters on the vessel got her off, repaired her at a cost less than half her value, and tendered her to the owner, who

refused to receive her. After the abandonment, the owner refused to have any thing to do with the vessel, and wrote to the charterer that the vessel was a wreck and in the hands of the underwriters, and that he could not proceed as per charter party. *Held*, that, there being no total loss of the vessel, and the owner having voluntarily abandoned the charter party, he was not entitled to recover the insurance on freight.

TORT for wrongfully cancelling and surrendering a policy of insurance on freight of the brig Rosetta. At the trial in this court, before *Ames*, J., the jury returned a verdict for the defendants; and the plaintiff alleged exceptions, the material parts of which appear in the opinion.

*W. S. Macfarlane*, for the plaintiff.

*C. T. Russell*, for the defendants.

ENDICOTT, J. The plaintiff was the equitable owner of this vessel. He had made a bill of sale of her to his brother, who was the master. There was no consideration for the sale, but it was made to enable the master to sell her if an opportunity should offer ; and the master gave back a declaration of trust, binding himself to account to the plaintiff for the proceeds in case of sale. It was ruled at the trial that the plaintiff could maintain the action, and no question is before us touching the correctness of this ruling. As the record title stood in the master, who held it for the benefit of the plaintiff, all his acts and declarations in connection with the vessel must be taken to have the same force and effect as if done or made by the plaintiff himself.

The vessel was stranded on the east point of Prince Edward's Island on July 10, 1865, while on her voyage from Boston to Richibucto, whither she was bound, to take on board a cargo of deals for England, under a charter party which had been executed by the master and the charterer, who resided in New Brunswick, and which required the vessel to proceed there " with all convenient speed." The plaintiff was on board at the time. Upon the freight to be earned on this cargo, the insurance had been obtained by the defendants in their own name for the benefit of the plaintiff, which is the principal subject matter of this controversy. The plaintiff had no insurance on the vessel, but the mortgagee, to whom she had been mortgaged by him for nearly her whole value, had insurance upon the vessel in several offices in Pictou. How far and in what manner

the plaintiff was interested in that insurance the record does not disclose.

It is stated in the bill of exceptions that the master, after an unsuccessful attempt to get the vessel off, noted a protest which he afterwards extended, and called a survey. The report of the surveyors condemned her, and recommended a sale, which was notified to take place on July 18, 1865. Notice of this was given to the mortgagees, and, before the day appointed for the sale, the agent of the underwriters at Pictou arrived with instructions to get the vessel off if possible. The sale did not take place, and the master gave written notice of abandonment to the agent, and sent a similar notice to the underwriters at Pictou. In the last notice, he says : " I do not wish to oppose your desire to get the Rosetta afloat again, but the said vessel is now entirely in your own hands, likewise risks and consequences." The underwriters refused to accept the abandonment, and the agent succeeded in getting her off, and took her into Pictou, some thirty or forty miles distant, on July 23, 1865, for repairs. The insurers at Pictou soon after notified the master that they were repairing the vessel, and requested him to come to Pictou, inspect their doings and see to her fitting out, to which the master replied that he had abandoned to them, and had no further concern in the matter. On August 21, 1865, the underwriters wrote to the master that the vessel was thoroughly repaired, ready for sea, and lying in Pictou harbor in a perfectly seaworthy state, at his disposal. They also informed him that if the mortgagees, to whom they had given notice of her position, should proceed to sell her under their mortgage, they, as insurers, could offer no objection, as the settlement of the mortgagees' claim was a duty devolving on the owners, and not on the underwriters. This letter was duly received within a few days, but no reply was made to it, and neither the master nor the plaintiff went to Pictou. Nor does it appear that the plaintiff or the master had any communication with the mortgagees. On August 30, 1865, the mortgagees took possession of her, and, after a formal sale for the purpose of foreclosure, she was sold by them for $7900, and has been in constant use since, principally as a collier, but occasionally making voyages to the West Indies. The expense of raising and repairing her did not exceed $1200, much less than

half her value, which appears to have been estimated at more than $8000.

While the vessel was aground at Prince Edward's Island, the master sent his protest to the defendants by mail, which was received. The plaintiff afterwards notified them of the abandonment, that the underwriters were refitting her, and stated that, "should they tender me the vessel when repaired, I will not take her back." He also requested the defendants to demand the insurance on the charter party. To this letter a reply was sent, that the insurance office declined to pay, as the underwriters at Pictou were repairing the vessel. On August 18, 1865, and before the conclusion of the repairs, the master wrote to the agent of the party who had chartered the vessel, that the vessel was stranded on July 10, 1865, and became a total wreck; that he had abandoned her to the underwriters, who had got her afloat and taken her to Pictou; and he states that he "cannot proceed as per charter party between you and the owners."

Upon the facts here stated there is no dispute. No claim is made that the underwriters did not act in good faith in taking possession of and repairing the vessel, or that they did not make what they considered to be substantial repair and restoration, putting her in as good a condition as she was before. And it is conceded that there was no evidence at the trial that the work of repair was delayed, or was not prosecuted and finished within a reasonable time and with proper dispatch.

We are of opinion that, upon these facts, the presiding judge might properly have ruled that there was no constructive total loss of the ship, but only a partial loss.

When a vessel is stranded or submerged, there is not necessarily a total loss, for she may be got off or raised, and the damage may be small. An abandonment of her under such circumstances by the owner is not binding on the insurers, nor are they concluded by the report of a survey condemning her and recommending her sale. They may take possession of her, raise and repair her, when the owner refuses or declines; and, if they can do this for less than half her value, they may return her to the owner, and thus avoid payment of a total loss. This must be done expeditiously, and within a reasonable time; for, if they neglect their duty in this regard, they cannot return the ship,

and must be presumed to have taken her under the abandonment. This has been settled in numerous cases in this Commonwealth. *Wood* v. *Lincoln & Kennebeck Ins. Co.* 6 Mass. 479. *Peele* v. *Suffolk Ins. Co.* 7 Pick. 254. *Commonwealth Ins. Co.* v. *Chase*, 20 Pick. 142. See also *Hall* v. *Franklin Ins. Co.* 9 Pick. 466; *Sewall* v. *United States Ins. Co.* 11 Pick. 90. In *Commonwealth Ins. Co.* v. *Chase*, it was said by the court " that this right on the part of the underwriter, to act for the preservation of the property insured, is one of great importance. It works well for the cause of truth and justice. It proceeds upon the principle of indemnity, on which the law of insurance rests." The insurers, to whom the Rosetta had been abandoned, could properly take her and make the experiment, and upon its result the validity of the abandonment depended. If they in all respects performed their duty, and the expense of raising and repairing did not exceed half her value, it was a partial loss, and the abandonment was invalid; if they did not, there was a constructive total loss, and the abandonment was effectual. What happened afterwards must determine the question. The subsequent acts of the parties, including the underwriters, the plaintiff and the mortgagees have been fully detailed, and we think the case falls clearly within the rule laid down by Chief Justice Shaw in *Reynolds* v. *Ocean Ins. Co.* 22 Pick. 191, " that if the underwriters, after having refused to accept the abandonment, took possession of the vessel, for the actual and declared purpose of getting her off, repairing and restoring her to the assured, and in good faith intended and with reasonable diligence proceeded to make full and complete repairs, and in good faith, according to their intent, did make what they considered and believed to be a substantial repair and restoration of the vessel to as good a condition as she was in before, and in this state tendered her to her owners, it was a substantial performance of their contract, and the assured were bound to accept her; that if, at the time of such tender, the assured made no objection to the sufficiency or completeness of the repairs, nor pointed out any deficiency, the tender should be deemed good, although it might be discovered afterwards that there were deficiencies in the repairs." This rule, of course, applies only to those cases where the expenses would not amount to fifty per cent., deducting one third new for old, and making

other usual and proper deductions. If the underwriters have conducted themselves in the manner pointed out, and within a reasonable time tendered the vessel to the assured, who makes no objection to the sufficiency of the repairs, and points out no deficiencies, he is bound to accept her, and the underwriters cannot be treated as having accepted the abandonment. Whether the assured accepts or not, the question is settled that there is no constructive total loss of the ship.

If it should afterwards appear that there are deficiencies in the repair, the acceptance of the vessel does not preclude the assured from claiming further damage, and, according to the principles of the contract securing to the assured an indemnity, an action might be brought, after such acceptance, to recover for any such deficiency or unrepaired damage, as a partial loss. The rights of the assured are thus fully protected. He must act in good faith. If he does not and cannot point out deficiencies and call the attention of the underwriters to them, so that they may be supplied, he must take the ship, and, if they prove to be insufficient, he may recover for an additional partial loss. And, if the deficiencies should prove to be such as the plaintiff now claims to exist in this particular ship, he might recover her full value. He cannot, when the underwriters have done their whole duty, lie by silent and inactive, take no notice of the tender, or refuse to have anything to do with the ship because he abandoned her when she stranded, and then recover from the underwriters as for a total loss on proving that the repairs were insufficient. To allow him to do so would be to defeat and make utterly worthless the privilege of the underwriters to raise and repair the ship for the benefit of all concerned, and to demonstrate, as it is their right to demonstrate, that the claim made upon them is unfounded, and that the abandonment was unnecessary.

Nor is the rule laid down open to the objection, urged by the plaintiff at the argument, that it cannot be reconciled with the doctrine that, unless the underwriters make thorough repairs, they accept the abandonment. The chief justice fully disposes of that question, in *Reynolds* v. *Ocean Ins. Co.*, *ubi supra*, when he says, in speaking of the duty of the underwriters, that if they did "not in good faith and with reasonable diligence proceed to

make a full and complete repair and reëquipment of the vessel, or if, at the time of the offer to restore the vessel as fully repaired and equipped, the assured pointed out deficiencies which actually existed, and the underwriters refused or unreasonably neglected to supply these deficiencies, and complete the repair and equipment, then the assured were not bound by the tender; and as the underwriters, after the offer to abandon, had taken the vessel into their possession, for the avowed purpose of repairing, but had not made such repair, they must be considered as having made her their own, and as having accepted the abandonment, and then the assured would be entitled to recover for a total loss. After such a recovery, by force of the abandonment, and by such acceptance of the abandonment as established by the judgment, the vessel would remain the property of the underwriters." It is said in the argument that this case is in conflict with other authorities, but we do not so regard it, and see no reason for departing from the rule laid down and acted on in this Commonwealth for nearly forty years. See *Paddock* v. *Commercial Ins. Co.* 104 Mass. 521, 534. In *Copelin* v. *Insurance Co.* 9 Wall. 461, which is relied on by the plaintiff, the decision was on the ground that there was an unreasonable delay in repairing, and does not touch the question here presented.

No element is wanting in the case at bar to bring it within all the qualifications mentioned in *Reynolds* v. *Ocean Ins. Co.* There was no unnecessary delay; there is no claim that the underwriters did not act in good faith; no objection to the sufficiency of the repairs was made or pointed out at the time of the tender, and no question is raised that deficiencies appeared afterwards. That question, indeed, cannot arise on the facts here presented. The plaintiff assumed throughout the proceedings, and so contends in his argument, that his right to recover for a total loss of freight, on the ground of a total loss of the ship, was fixed by his abandonment at the time of the stranding. Acting upon this erroneous assumption, he steadily refused to take any notice of the repairs, or to admit that he had anything to do with the ship; and, although he and the master were on board at the time of the stranding, and were afterwards not far distant from Pictou, it does not appear that either of them visited or saw the vessel after she went to Pictou.

If we regard the plaintiff as having the same rights that he would have had, if the insurance had been on his interest as owner and not on the mortgagee's interest, (and certainly he has no greater rights,) he cannot, upon the facts disclosed, set up that there has been a constructive total loss of the ship.

If, on the other hand, having no insurance on the ship, all the rights that he had were under the contract of insurance between the underwriters to whom he had abandoned the ship, and the mortgagees who held the mortgage given by him, then the acceptance of the ship and her sale by the mortgagees, they not making any objection to the repairs, and he failing to make any adjustment of their claim, preclude him, and he cannot assert there was a constructive total loss any more than the mortgagees can. He had full notice from the underwriters that they could interpose no obstacle to the mortgagees taking the ship, and no claim is made that the action of the mortgagees was not perfectly regular in form and in accordance with their rights.

We are therefore of opinion that there was no total loss of freight because of an actual or constructive total loss of the ship; and we fail to find in the cases previously cited, or in those mainly relied on by the plaintiff, anything in conflict with this conclusion. See *Jackson* v. *Union Ins. Co.* L. R. 8 C. P. 572; *S. C.* L. R. 10 C. P. 125; *Rankin* v. *Potter*, L. R. 6 H. L. 83, 98; *M'Gaw* v. *Ocean Ins. Co.* 23 Pick. 405, 409; *Thwing* v. *Washington Ins. Co.* 10 Gray, 443, 455; *Coolidge* v. *Gloucester Ins. Co.* 15 Mass. 341, 345.

There having been no total loss of the vessel, the only further question that can arise would be, whether by reason of the delay caused by the peril of the sea, and the time employed in making the necessary repairs, the vessel was unable to reach Richibucto in season to carry the cargo in accordance with the charter party. That she was able to reach Richibucto is evident from the fact that she has ever since been engaged in sea voyages, so that the only question would be whether she would be able to get there and obtain the cargo. We have great doubt whether this question is open to the plaintiff on the pleadings. The action was tried, so far as this branch of the case is concerned, upon the amendments to the declaration, included in the fourth and seventh counts for wrongfully cancelling and surrendering the policy of

insurance, which, at the plaintiff's request and for his benefit and in their own names, the defendants had procured on the freight from Richibucto to England. It is alleged in the fourth count that the ship " was totally lost and destroyed by the perils of the sea whereby the freight was totally lost to the plaintiff ; " and in the seventh count that, " while proceeding on said voyage said vessel was so wrecked, injured, and destroyed by the perils of the sea as to be incapable of performing the same so as to earn the freight insured by said policy, whereby said freight was totally lost to the plaintiff." Both counts proceed upon the ground that the ship was either totally lost, or was utterly incapable of proceeding as a ship to Richibucto. There is no claim for damages, distinctly set forth, on the ground that she was so delayed by the perils of the sea and consequent repair, that she could not reach her port in season to earn the freight. But it does not appear that this question was raised or considered at the trial, and we are not inclined to decide this portion of the case on that ground, as we are clearly of the opinion that the plaintiff by his acts and declarations voluntarily abandoned his charter party on the ground of a total loss of the ship and on that ground alone ; and relieved the charterer from any obligation of putting the cargo on board as provided in the charter party. Throughout the proceedings he refused to have anything to do with the ship after she was stranded. He so states in his letter to the defendants of July 29, 1865 ; and in that of August 10, 1865, he says, " should they tender me the vessel when repaired, I shall not take her back." He acted throughout in accordance with this resolution. The ship not being lost, he was bound to proceed and execute his charter party. The time taken in extricating and repairing the ship, made necessary by reason of perils of the sea, was not so long as necessarily and as matter of law to absolve the charterer from his obligation. But, without making any attempt to execute it, he wrote on August 19, 1865, to the agent of the charterer, who had entered into the charter party on behalf of his principal, that the vessel went ashore and became a total wreck, that she was in the hands of the underwriters, and that he " cannot proceed as per charter party between you and the owners." This was sent before the completion of the repairs, and before the tender and subsequent

proceedings, which established the fact, binding on the plaintiff, that the abandonment was ineffectual and that there was no total loss. The charterer was therefore no longer bound to furnish him with the stipulated cargo, and would have been justified in shipping it by another vessel. The plaintiff having done this, he was not entitled to go to the jury and recover damages on the ground that, by reason of the delay, the charterer was free and no longer bound to perform the requirements of the charter party. From that duty the plaintiff had absolved him, by declaring that he was himself unable to have his vessel there.

It is conceded by the plaintiff to have been proved, if admissible, that if the vessel had proceeded to Richibucto any time in August or September, she could have obtained the like freight with that described in the charter party, upon as favorable or more favorable terms. But in our view of the case we have not thought it necessary to consider the admissibility of the evidence, or to determine whether the whole right and interest of the plaintiff rested on the particular charter party, or whether he was bound to proceed and obtain another cargo if that failed him. For the same reason, we have not placed any stress upon or considered the competency of the testimony of the charterer himself, introduced in reply to the evidence of the plaintiff on this point, that he would have furnished the cargo under the charter party any time up to the middle of November.

Upon the facts disclosed on the bill of exceptions about which there is no dispute, the presiding judge would have been justified in ruling that the plaintiff was not entitled to a verdict. It is therefore unnecessary to consider the exceptions or the criticisms to the charge of the presiding judge in submitting the case to the jury.　　　　　　　　　　　　　　　　*Exceptions overruled.*