## THE NORTHWESTERN TRANSPORTATION COMPANY v. THE THAMES AND MERSEY INSURANCE COMPANY, OF LIVERPOOL, LONDON AND MANCHESTER.

*Marine Insurance—Abandonment and acceptance, effect of—Evidence to establish.*

Plaintiff's steamer, insured by defendant against total loss and general average only, was wrecked during life of policy, and defendant assumed exclusive control of wrecking operations which were carried on until late in November, when the wreck-master, contrary to the protests of plaintiff, left the steamer, notifying plaintiff that he had concluded to let her lie where she was until spring. He was notified that if the steamer was not gotten off immediately, plaintiff would abandon her to defendant, as a total loss, and on December 13, through its president, who held a mortgage on the vessel, plaintiff gave written notice of such abandonment, to which no reply was made or attention given, and the vessel was allowed to remain where she was stranded until the following summer, when defendant delivered her in the Detroit dry dock in a damaged and wrecked condition, without instructions to the company about making repairs. Thereupon plaintiff, through its president, served a second notice on defendant insisting upon the abandonment made the fall before, as a constructive total loss, and offering to put vessel in a condition to

keep her afloat, remove her from the dry dock and hold her subject to the order of insurers and at their risk, but demanding payment of the amount of the policy.   The making of these repairs was agreed to and were made, after which defendant tendered the steamer to plaintiff at the dock in Detroit, in her otherwise wrecked and damaged condition, without offer to pay the amount necessary to restore her to her former condition, which tender was refused and she was libeled and sold for the bill of the dock company.

The jury found that the steamer could have been gotten off in November or December, so as to be repaired for the next season's business, if defendant had used due diligence, and the abandonment to defendant by plaintiff of the vessel, and rendered a general verdict in its favor for the full amount of insurance covered by the policy.

*Held,* that the jury must have further found an acceptance, by the defendant, of the abandonment, in which case it was immaterial whether the total loss exceeded fifty per cent. of the value of the vessel or not.   That an abandonment made under the circumstances of this case and accepted by the insurers, was sufficient to fix their liability as for a constructive total loss, even though the damage should afterwards be found to be less than the requisite amounts. That after abandonment and acceptance neither party can recede, the title passes to the insurer and a deed of abandonment is not essential to the rights of either party, and unless required by the policy the abandonment need not be in writing and no particular form of words is necessary.

*Held, further,* that the execution by plaintiff's president of the notice of abandonment, of December 13, 1883, operated as a discharge of his mortgage on the steamer, and upon defendant's acceptance of the abandonment, he was precluded from ever after asserting any interest in the property antagonistic to that conveyed by the abandonment and acceptance.

*Held, further,* upon a review of the facts that such acceptance was fully made out and justified the verdict of the jury.

Error to Wayne.   (Jennison, J.)   Argued November 18, 1885.   Decided January 20, 1886.

Assumpsit.   Defendant brings error.   Affirmed.   The facts are stated in the opinion.

*Maynard & Swan,* for appellant:

There being no actual total loss of the vessel, proof of an abandonment by the insured was an essential condition of recovery, even though the loss exceeded in amount the sum fixed by the policy: *Kaltenbach v. Mackenzie,* L. R. 3 C. P.

Div. 467, 471 ; *Hubbell v. Great Western Ins. Co.*, 74 N. Y. 246, 260 ; *Globe Ins. Co. v. Sherlock*, 25 Ohio St. 60–5 ; and the exercise of this right is limited and must be measured by the policy under which plaintiff claims, which requires a written notice signed by assured and delivered to defendant or its authorized agents, and efficient, if accepted, to convey an unencumbered title to the vessel : *Wallace v. T. & M. Ins. Co.* 22 Fed. Rep. 70 ; *Orrok v. Commonwealth Ins. Co.* 21 Pick. 467, 470 ; and it must state the reason for abandonment : *King v. Delaware Ins. Co.* 2 Wash. 300, 307 ; *Bullard v. Roger Williams Co.* 1 Curtis, 148 ; *McConochie v. Sun Ins. Co.* 26 N. Y. 477 ; *Hazard v. New England Ins. Co.* 1 Sumner, 218 ; *Peirce v. Ocean Ins. Co.* 18 Pick. 83 ; while the letter and notice introduced in evidence might be admissible were the plaintiff a domestic corporation, and the subject matter of the abandonment controlled by our laws, it and defendant being British subjects, and the conveyance of the steamer subject to the laws of her flag, it was incumbent on plaintiff to make affirmative proof of same in support of its alleged conveyance : *Chapman v. Colby*, 47 Mich. 46; but to remove all doubt of the defectiveness of the letter of December 13, defendant made proof of the Merchants' Shipping Act, 17 and 18 Victoria Statutes, 445 ; the effect of which is to nullify said letter in law and equity, as a transfer of the steamer : *Liverpool Borough Bank v. Turner*, 2 Deg. F. & J. 502, 507 : s. c. 1 John & Hem. 159 ; the position of plaintiff is analogous to that of a vendor asking specific performance of a contract, and it cannot ask defendant to accept a doubtful title : *Powell v. Conant*, 33 Mich. 299 ; and it must make a case showing to a moral certainty that defendant would receive such a title as it had contracted to take, as a condition precedent to payment of the whole loss : *Hinckley v. Smith*, 51 N. Y. 21 ; but independent of this provision of the policy the law is settled that in a policy on time or for a voyage, a merely temporary retardation of the voyage by any of the perils insured against, not amounting to or producing a total incapacity of the ship eventually to perform the voyage, does not constitute a technical total loss, which will authorize an abandonment ; 2 Phillips on Ins. 249, 250 ; *Bradlie v. Maryland Ins. Co.*, 12 Peters, 400.

The mortgage on the vessel, to the president of plaintiff, was sufficient to invalidate this notice : *Hughes v. Tindall*, 18 C. B. 98 ; *Gordon v. Mass. F. & M. Ins. Co.* 2 Pick. 249 ; *Bidwell v. N. W. Ins. Co.* 19 N. Y. 179 ; and defendant was under no moral or legal obligation to point out these

defects.  If the insurer says and does nothing the proper conclusion is that he does not intend to accept, which applies with peculiar force to corporations: *Peele v. Merchants' Ins. Co.* 3 Mason 27, 81; *Badger v. Ocean Ins. Co.* 23 Pick. 347; 2 Parsons on Marine Ins. 177.

*Moore & Canfield*, for plaintiff:

The situation of the stranded steamer was such as prima facie entitled plaintiff to abandon her and claim for a total loss.  It is not necessary that the vessel should be totally destroyed in order to be regarded as a total loss: Parsons' Marine Ins. 71; *Sewall v. U. S. Ins. Co.* 11 Pick. 90; Lee on Ins. 462; *Irving v. Manning*, 1 H. L. Cases, 287; 2 Arnould on Ins. 1021; *Gracie v. N. Y. Ins. Co.* 8 John. 244; *Cologan v. London Assurance Co.* 5 M. & S. 447.

The right of abandonment depends upon the facts at the time and the conclusions, which reasonable men ought then to draw from them in the exercise of a sound discretion: *Cincinnati Ins. Co. v. Bakewell*, 4 B. Mon. 547; *Bradlie v. Md. Ins. Co.* 12 Peters, 378; 3 Kent Com. 322; and the right to claim for a total loss is not defeated, because by reason of some fortuitous event the vessel is subsequently rescued and brought into port.  The insured is not bound to wait indefinitely the experiments, which the underwriters may conclude to try: *Kemp v. Halliday*, 6 B. & S. 749; 2 Phil. on Ins., § 1536; *Peele v. Ins. Co.* 3 Mason, 65–7; *Norton v. Lexington Ins. Co.* 16 Ill. 246; 3 Phillip's Ev. (C. & H. notes), page 259 and note 833; and we insist that the loss in this case was constructively total and justified the abandonment made: *Provinical Ins. Co. v. Leduc*, 6 L. R. P. C. C. 242; 11 Eng. 100; *Cincinnati Ins. Co. v. Bakewell*, 4 B. Mon. 543; *Heebner v. Eagle Ins. Co.* 10 Gray, 131.

The notice of abandonment was sufficient: *N. W. Trans. Co. v. Continental Ins. Co.* 24 Fed. Rep. 171, 179; it was the act of plaintiff through its president and general manager, acting officially.  He had the authority, and no resolution by the directors was necessary, but the record shows a ratification by plaintiff and the suit is sufficient evidence thereof: *Finney v. Ins. Co.* 5 Metc. 192; *Williams v. Ins. Co.* L. R. 1 C. P. D. 757; 18 Eng. 305; 1 Phillip's Marine Ins. § 889; the form of abandonment was sufficient and no express set of words is necessary: Lee on Ins. 485; 2 Phil. on Ins., § 1678; *Columbian Ins. Co. v. Catlett*, 12 Wheat. 383; *Patapsco Ins. Co. v. Southgate*, 5 Pet. 604; 2 Parsons on Ins. 172; Barber on Ins. 357; *Heebner v. Ins. Co.* 10

Gray 139; *Chesapeake Ins. Co. v. Stark*, 6 Cranch, 268; *Reynolds v. Ins. Co.* 22 Pick. 192–9.

The sufficiency of the notice is not affected by the British statute offered in evidence; it was never intended to apply to transfers by abandonment, and no evidence was offered to show that the section relied upon was in force in the Dominion of Canada; *Currie v. Bombay Native Ins. Co.*, L. R. 3 P. C. App. 72; *Provincial Ins. Co. v. Leduc*, 6 P. C. 224; *Knight v. Faith*, 15 Q. B. 649; Lee on Marine Ins. 485; 2 Arnould on Ins. 1174; *Kaltenback v. Mackenzie*, L. R. 3 C. P. D. 477, 478, 484; *Rankin v. Potter*, L. R. 6 H. L. Eng. & Irish App. 118, 119; *Ins. Co. v. Younger*, 2 Curtis, 329.

The notice of abandonment being given by the mortgagee, who was plaintiff's president estopped him from asserting any claim under mortgage, and rendered the abandonment efficient to transfer title free from that incumbrance: *N. W. Trans. Co. v. Continental Ins. Co.* 24 Fed. Rep. 179; Herman on Chattel Mortgages, 355; *Dann v. Cudney*, 13 Mich. 239; *Truesdail v. Ward*, 24 Mich. 117; *Meister v. Birney*, 24 Mich. 435; *Hayes v. Livingston*, 34 Mich. 387.

The abandonment whether justified by the extent of the damage, or not, if accepted entitled plaintiff to recover as for a total loss: 2 Phillips on Ins., 391, 392, 394–5; 2 Greenl. on Ev. § 392; 2 Parsons' Marine Ins., 177; Barber on Ins. § 144; and such acceptance may be express or constructive: 2 Phillips on Ins. §§ 692, 1693; *Peele v. Ins. Co.* 7 Pick. 254; *Badger v. Ins. Co.* 23 Pick. 355; *Peele v. Merchants' Ins. Co.* 3 Mason 81; *Reynolds v. Ocean Ins. Co.* 22 Pick. 191; the jury found, and the fact is therefore considered as established, that the defendant did not act with reasonable diligence in rescuing the steamer after having taken possession of her for that purpose. The following authorities seem to be conclusive on this point: *Copelin v. Ins. Co.* 1 Woolw. 280 (9 Wall. 461–7); *Norton v. Lexington Ins. Co.* 16 Ill. 235; 2 Parsons' Marine Ins. 142–3; *Reynolds v. Ins. Co.* 22 Pick. 191; *Marman v. Melledge*, 123 Mass. 174; *Young v. Union Ins. Co.* 24 Fed. Rep. 279; *Peele v. Suffolk Ins. Co.* 7 Pick. 254; 3 Phil. Ev. (C. & H. notes), 263, particularly note 833, p. 259; 2 Phillips on Ins., 1693; *Badger v. Ins. Co.* 23 Pick. 355.

CHAMPLIN, J. Plaintiff brought an action upon a policy of marine insurance, issued by the defendant upon the steamer Manitoba, whereby the plaintiff, as owner, was insured in the sum of $7,500, against total loss and general

average only.   The steamer was valued in the policy at $36,000.   She was also insured by the Insurance Company of the State of Pennsylvania in the sum of $3,350; by the Continental Insurance Company, $10,000; and by the Union Insurance Company in the sum of $10,000—leaving $5,150 at owner's risk.   On the sixth of November, 1883, the policies being then in force, the steamer left the port of Port Arthur, on Lake Superior, bound for Sarnia, Ontario.   She reached Southampton, on Lake Huron, November 11th.   The wind was then blowing from the southwest.   Soon after her arrival at Southampton, and while she was moored alongside the breakwater, the wind suddenly veered to the northwest, and came down in a terrific gale, and increased to a hurricane, which caused the steamer to part her moorings and drift into the harbor.   Both her anchors were dropped, and the cable of the small anchor parted.   Her large anchor, with full scope of chain, was not able to hold her, and she drifted away to leeward.   About 4 o'clock the next morning her large anchor chain parted.   She was then run inside the breakwater, and to save her from going ashore, her large hawser was gotten out to a snubbing-post, which, however, snapped and was carried away at once.   Lines were then gotten out on her starboard side forward, which held her for a time, when a terrific blast from the northwest struck her with such force as to part her lines, and fearing that she would be driven upon a lee shore and totally lost, her master voluntarily stranded her on the shore of Chantry island, near the mouth of the harbor.   The storm continued with little intermission for about eight days, causing the steamer to roll and pound upon the rocks at the place where she was stranded, and to spring a leak; and, to prevent greater damage, the sea-cocks were opened, the steamer was allowed to fill and settle upon bottom.   After the steamer was thus voluntarily stranded, her passengers, to the number of 16, were taken ashore.   She was without cargo except 160 barrels of salt fish, which were landed about the same time at Southampton.   Efforts were made as promptly as possible by the plaintiff to rescue and care

for the steamer, and considerable expense was incurred in such undertaking, but without success. The underwriters were promptly notified of the disaster, and sent wrecking tugs to her assistance. Subsequently, through their general agents, Crosby & Dimick, of Buffalo, they sent Capt. Rardon, as wreck-master, to take charge of the operations for the rescue of the steamer. Upon his arrival Rardon, as agent of the insurers, took possession of the steamer, and assumed exclusive control of the wrecking operations. He continued his efforts to release the steamer, without success, until November 27th, when he received instructions from the insurance companies to go to the rescue of the propeller Enterprise, then stranded at Green island, which was also insured by the same underwriters, or one of them. In pursuance of these instructions, Rardon, as the plaintiff claims, placed a couple of watchmen in charge of the Manitoba, and went to the Enterprise, taking with him the wrecking tugs, steam-pumps, and other wrecking apparatus which had been employed at the Manitoba. On November 27th, before going to the Enterprise, Rardon informed Mr. Beatty, the president of the plaintiff corporation, that he had concluded to leave the Manitoba, and "let her lay there until spring." Mr. Beatty protested against this being done, and notified Rardon that the plaintiff was ready to pay its proportion of the expense of taking the Manitoba off, and that if she was not gotten off immediately he would abandon her to the insurance companies, adding that "leaving her there until spring means total loss." On the next day Dimick, one of the general agents of the defendant, was telegraphed: "If no answer about getting Manitoba off, Beatty will abandon her to the insurance companies to-morrow morning." This dispatch was sent through A. H. Dalziel, who was the insurance agent at Sarnia, who effected the insurance on the vessel, acting on behalf of defendant's agents at Buffalo. Other telegrams of a similar nature were sent to the general agents at Buffalo. Notwithstanding the protests and objections of the plaintiff, the underwriters ceased their efforts to release the steamer, and suffered her to remain

where she was stranded until the latter part of May or the first of June following. On the thirteenth of December, 1883, the plaintiff, through its president, sent to each of the insurance companies interested a notice of abandonment. That sent to the defendant was as follows:

SARNIA, December 13, 1883.

" *To the Thames & Mersey Insurance Company:* The steamer Manitoba, of the . Northwest Transportation Company, limited, was insured in your company in May last, against total loss and general average, fire clause exempted. She had to be beached in the harbor of Southampton during the storm of the eleventh and twelfth of November, or on the morning of the twelfth, and still remains there, during which time efforts have been made to take her off, without success. Before Mr. Rardon, your general agent, left for another wreck, he advised me of his intention to leave the steamer Manitoba there until spring. To this I gave my distinct refusal, stating that she must be got off this fall, and that I was prepared to pay my proportion of the expenses. An offer was obtained from Mr. Murphy, of Detroit, that he would furnish a complete outfit for taking the steamer off for $500 per day, or $10,000, under a guaranty to take her off or no pay, which offer was refused by your agent. He ordered the steamer laid up, in opposition to my instructions to proceed and take the steamer off. Regarding her as a wreck, I accordingly abandoned her to the insurance companies' agent, and now notify you that I have abandoned the steamer Manitoba to you.

" Yours truly,          JAMES H. BEATTY,
"(*President Northwest Transportation Company, Limited.*)"

No attention was given or reply made to this notice. In April following the defendant made a contract with Mr. Murphy to rescue the steamer, and he started from Detroit about the ninth of May, and as early in the season as the ice would permit, and he got the steamer off about the last of May or first of June, and brought her to Detroit in a wrecked and damaged condition, and placed her in dry-dock, where she was permitted to remain for several days without any one giving any instructions to the dry-dock company about making repairs. The president of the company then served upon the defendants the following notice:

" *To the Thames & Mersey Insurance Company :* We are

advised that the steamer Manitoba is in the Detroit dry-dock, at Detroit, where she was placed by her insurers, and that no repairs are being made upon her, and that charges and expenses are running up against her without any benefit to her. We therefore desire you to take notice that we shall insist upon abandonment of the steamer to her insurers as heretofore made, as a constructive total loss. For the purpose of saving increased expenses without profit we will put said steamer in such condition as will prevent her from sinking, and remove her from the dry-dock, and hold her subject to the order of the insurers, and at their risk; and further, we demand of you payment of the amount insured upon said steamer by your policy number 329.

"Yours,    JAMES H. BEATTY,
"*Manager Northwest Transportation Company*,
"Per JOHN D. BEATTY."

The notice was served by delivering the same to the general agents of defendant, in Buffalo, who then gave their permission that Mr. Beatty should have certain repairs made, and thereupon Mr. Beatty directed those repairs to be made, which appear to have been merely of a temporary nature, and for the purpose of keeping the steamer afloat. While she lay in dry-dock a survey was held by surveyors mutually chosen by the parties, who estimated the costs of the repairs at $8,391.39. The cost of survey was $50. Subsequently, and by mutual agreement, W. D. Robinson, of Buffalo, was chosen as an adjuster to adjust the expenses made necessary by the disaster, who made a statement of the matters referred to him, and reported, over his signature, on June 23, 1884, a copy of which was given to the underwriters, and a copy was given to the insured. By the adjustment as made by Mr. Robinson it appears that the entire expense incurred for salving and repairing the steamer was $25,124.07. The correctness of this adjustment is not conceded by the defendant, and the items going to make up the amount which should be chargeable under a claim of abandonment as for a total loss form one of the main subjects of contention in the case.

The jury also found specially that Capt. Rardon went, as agent of defendant, to the Manitoba while she was stranded,

and took possession of her, and assumed charge of the operations undertaken in November to get .the steamer off and that, as agent of the insurers, left said steamer, and caused her to be laid up at the place where she was stranded, against the objection and protest of the owners; that the steamer could have been gotten off in November or December so as to be repaired for the next season's business if the insurance company had exercised due diligence; and that Rardon, as agent for the insurance company, did not exercise proper diligence in getting the steamer off. They further said that they were unable to say at what cost the damage and injuries done to the steamer Manitoba by the voluntary stranding of the steamer, and consequent upon such stranding, could have been repaired, excluding the cost of floating and releasing the steamer, which they found to be $5,000, including the bringing her to Detroit. They further said they did not know what amount of money the insurers of the steamer were liable to pay under an adjustment as of a partial loss by reason of the stranding of said steamer under the evidence in the cause. They found as a fact that the plaintiff did abandon, in writing, the steamer Manitoba. They found, also, that the plaintiff, or its assistant manager, did not instruct J. J. Rardon, in April, 1884, that said steamer would have to go to Detroit for repairs and dockage, and was not brought there pursuant to such instructions. They also found, in answer to defendant's question that it was not practicable for plaintiff to effect the floating and release of the steamer Manitoba, in November, 1883, or in December, 1883, after the suspension of Rardon's efforts, by the use of the customary appliances for that purpose. They said they did not know what the expense was of wages and provisions of the crew of the Manitoba during the detention and stranding of the steamer in November, 1883; and they found that the charge made in the adjustment for lay days for the steamer in the dry-dock, up to June, awaiting instructions, of $586.88, is not included in the amount required to make a constructive total loss.

After the repairs mentioned, which, as before stated, were merely sufficient to keep the steamer afloat, the defendant, without having caused the steamer to be repaired in accordance with the survey, or having tendered the amount found by the surveyors to be necessary to restore her to her former condition, tendered her back to plaintiff while she was lying at the dock at Detroit, in her wrecked and damaged condition, and the plaintiff refused to accept her. It was admitted that the Manitoba was libeled and seized by the admiralty court for the Eastern District of Michigan, for the bill of the Detroit Dry Dock Company for docking and temporary repairs of the steamer, occasioned by the stranding; that a decree was taken against her for said claim, under which she was subsequently sold.

The court instructed the jury as follows:

"The complainant claims that in this case there was a constructive total loss, that the expenses already alluded to exceeded 50 per cent., and therefore they had the right, as a matter of law, to claim a constructive total loss. Now, the theory of the defense is—*first*, that there was no legal abandonment, or right of abandonment. They say that the notice was not a legal notice. The court will charge you here that, in its judgment, it was a legal notice. They say that the complainant did not have the right, under the circumstances of the claim and abandonment, to claim the constructive total loss; *second*, that the expenses claimed by the complainant are not recoverable by the terms of the policy; and, *third*, that the acts of the defendant in regard to the vessel did not, under the policy, compel them to go on and repair the vessel. I think that the letter of December 13, 1883, is a sufficient abandonment, taken in connection with other things. They had the right to do it, and they did exercise that right. I charge you, gentlemen of the jury, that if you believe the evidence of the complainant—and you are judges of that evidence—if you believe the evidence of the complainant, then you will be justified in finding—*first*, that there was an abandonment by the complainant to the defendant of the said vessel, and an acceptance by the defendant of the abandonment; and the complainant would be entitled to recover, if you believe their testimony, as for a constructive total loss—if you believe the defendant did not use reasonable diligence in raising and rescuing the steamer,

and also that the expenses exceeded 50 per cent.,—and your verdict would be $7,769 ; that is the amount, with interest added, if it is correct. You have the right to compute it yourselves.   If they are correct, the amount is $7,769 ; that being the amount insured by the terms of the policy.   But if you do not find that there was an abandonment and acceptance—that depends upon your belief of the testimony as to whether you are justified in finding it—but if you do not find that there was an abandonment and acceptance, and the expenses were less than 50 per cent., then your verdict would be for a partial loss, and, as I understand the counsel, they will then agree among themselves to refer to some one to determine details.   But in making up your minds, gentlemen, on the general question, you may consider the testimony of Mr. Beatty, the complainant's president.   He testified, in substance, that a year after the disaster, in September, 1884, and after the steamer had been brought to Detroit, he had an interview with the general agent of the defendant at their office in Buffalo concerning the matter; that the adjustment paper, which you have already seen produced here, was before them ; that this paper was prepared by Mr. Robinson, by mutual consent between the company and the complainant, and that he did make an adjustment in their behalf; that this paper was present, and that it showed the amount of the loss claimed, as the defendants have argued; that no objections were made by them to the amount as stated in that adjustment ; that the only question with them was that they did not agree with certain points decided by Mr. Justice Matthews, and desired the Supreme Court to pass upon those questions.   I call your attention to that, gentlemen, as bearing upon the question how far the defendant objected to this account as to the claims made by the complainant.   I say, gentlemen, if you believe the testimony of the complainant, and find an abandonment by it, and an acceptance by the defendant, the complainant is entitled to a verdict. If you do not believe it, your verdict will be for a partial loss, and counsel themselves will determine as to the amount in some other way."

From what has been said it is apparent that the main point in controversy is whether the jury were justified, from the evidence, in finding that the abandonment of the vessel was accepted by the defendant.   The court instructed them that if they found an abandonment by the plaintiff, and an

59 Mich.—15

acceptance by the defendant, the plaintiff was entitled to their verdict. They did find, in answer to a question submitted to them by the defendant, that the plaintiff abandoned the steamer Manitoba to the defendant, and they also found a general verdict for the full amount of insurance covered by the policy, and consequently must have found that the defendant accepted the abandonment. Upon no other theory can their verdict be sustained. Without proof of abandonment *and acceptance*, it was incumbent upon the plaintiff to prove abandonment, and that the amount of loss or damage adjusted under the terms of the policy, equaled or exceeded one-half of the value of the vessel as stated in the policy, and in this case equaled or exceeded $18,000. It would therefore have been necessary for them to answer the first and fourth questions submitted by the counsel for defendant, namely :

"*First*. At what cost could the damage and injuries done to the steamer Manitoba by the voluntary stranding of said steamer, and consequent upon such stranding, have been repaired, excluding the cost of floating and releasing said steamer ? "

" *Fourth*. What amount of money were the insurers of the steamer Manitoba liable to pay under an adjustment as of a partial loss, by reason of the stranding of said steamer Manitoba under the evidence in this cause ? "

To the first question they answered, " Unable to say ; " and to the fourth, " Don't know." In case the jury had not found that there was an abandonment *and acceptance* thereof, they were not justified in finding a verdict for the plaintiff without being able to answer these two questions.

In the case of *Orrok v. Commonwealth Ins. Co.* 21 Pick. 456, in which it was claimed there was a constructive total loss, the trial judge, of his own motion, directed the jury to make a special finding as follows : " The court desires the jury, if they find for a total loss, to state the items of damage which in their opinion, exceed one-half the sum insured." On review in the Supreme Court it was said :

" We do not think there was anything wrong or irregular in that instruction. In civil proceedings, the law and the

fact should be kept as distinct as possible, to the end that the law may be practically what it professes to be—a uniform rule of action."

In cases of this character, where items which are disputed go to make up an aggregate amount, and the rights of the parties depend upon the amount established, it becomes important to know what items are included by the jury in the total found by them, and in this case, if the right to a recovery as for a total loss depended upon the amount, it was material and important that the jury should find what the amount was that went to make up the total loss. But if the jury found, as they appear to have done in this case, that the steamer had been abandoned and accepted, then it became of no sort of consequence whether the total loss exceeded 50 per cent. of the value of the vessel or not. The vessel was stranded, and in an exposed place, where she would be compelled to remain from five to six months, exposed to the action of the storms and ice, resulting in damage to the vessel that necessitated extensive and costly repairs, and she was in a position where a prudent owner might well apprehend that leaving her there during the winter meant a total loss. An abandonment made under these circumstances, and accepted by the insurers, was sufficient to fix the liability of the company as for a constructive total loss, even though the damage should afterwards be found to fall short of the requisite amount. After abandonment and acceptance it is too late for either party to recede. The title passes to the insurer, and he becomes the owner. If the loss turns out to be less than 50 per cent., that fact does not operate to transfer the title, or give to the insurer the right to surrender or tender the vessel to the assured.

The plaintiff argued before us that the facts in the case showed an actual total loss; but as the steamer was rescued, and taken into the port of Detroit, no attention need be paid to this branch of the argument.

The policy upon the subject of abandonment reads as follows:

"It is agreed that the acts of the insured, or insurers or their agents, in recovering, saving, and preserving the property insured, in case of disaster, shall not be considered a waiver or an acceptance of an abandonment, nor as affirming or denying any liability under this policy; but such acts shall be considered as done for the benefit of all concerned, and without prejudice to the rights of either party. Further, the insured shall not have a right to abandon the vessel, in any case, unless the amount which the insurers would be liable to pay under an adjustment, as of a partial loss, shall exceed half the amount insured; nor shall detention, by the season, or by any other cause, be alleged or allowed as cause for abandonment. Moreover, no abandonment, in any case whatever, and even when the right to abandon may exist, shall be held or allowed as effectual or valid, unless it shall be in writing, signed by the insured, and delivered to the said company, or to their authorized agents; nor unless it shall be efficient, if accepted, to convey to and to vest in the said insurance company an unincumbered and perfect title to the subject abandoned; and the valuation of said vessel, expressed in this policy, shall be considered the value in adjusting losses covered by this policy."

Under this clause of the policy, it is contended, on behalf of the defendant, that, to entitle the plaintiff to recover for a technical or constructive total loss, he must establish by proof one of the following propositions: "(1) Loss of the required character and amount, followed by an abandonment in compliance with the contract, or a waiver thereof; or (2) a loss, even if sufficient in amount, which was followed by an abandonment, accepted in fact;" that is, I suppose the counsel means by "accepted in fact" an express acceptance; "or (3) a loss, whatever its amount, followed by an abandonment to which the law attaches an acceptance because of action or inaction on the part of the insurer, to the detriment of the insured."

The third ground stated is the only one that concerns us under the evidence as disclosed by the record, the charge of the court, and the verdict of the jury. By the well-established principles of marine insurance a deed of abandonment is not essential to the rights of either party, as the title

passes, and the property vests, in the insurer immediately on abandonment.  *Chesapeake Ins. Co. v. Stark,* 6 Cranch, 268; Lee, Ins. 486; Phil. Ins. § 1693.  No particular form is necessary, and unless required by the policy, it need not be in writing:  *Patapsco Ins. Co. v. Southgate,* 5 Pet. 604; *Bell v. Beveridge,* 4 Dall. 272; *Heebner v. Ins. Co.* 10 Gray, 139.

Under the policy in question all that is requisite is that it must be in writing, signed by the insured, and be efficient, if accepted, to convey to and vest in an insurance company an unincumbered and perfect title to the Manitoba, and be delivered to the defendant or its authorized agent.  The paper writing dated December 13, 1883, addressed to defendant, and signed by the president of the company, and transmitted to the defendant's agent, I consider a sufficient compliance with the terms of the policy, especially if the defendant is held to have accepted the abandonment; for an act of abandonment, when accepted, has all the effects which the most full and accurate assignment could accomplish: *Comegys v. Vasse,* 1 Pet. 193.

Three objections are urged against the sufficiency of the above-mentioned writing: (1) That it states no sufficient cause for abandonment, (2) it does not comply with the terms of the act of parliament of Great Britain, entitled "An act to amend and consolidate the acts relating to merchant shipping," on the subject of "transfers and transmissions," which requires that registered ships, or any share therein, when disposed of to persons qualified to be owners of British ships, shall be transferred by bill of sale, and such bill of sale shall contain such description of the ship as is contained in the certificate of the surveyor, or such other description as shall be sufficient to identify the ship, to the satisfaction of the registrar, and shall be according to the form marked "E" in the schelude hereto, or as near thereto as circumstances may permit, and shall be executed by the transferrer in the presence of, and be attested by, one or more witnesses; (3) the steamer was incumbered at the time with a mortgage running to the president of the corporation

owners in the sum of over $64,000, which was then undischarged.

I think the first point untenable. The cause for abandonment is sufficiently stated.

Neither do we think the second objection is well taken. There is nothing in the statutes of 17 and 18 Vict. c. 104, § 55, above quoted, which indicates that an abandonment such as that under consideration would not vest in the insurers, when accepted by them, an efficient title to the property abandoned. Indeed, I do not think the statute refers to cases of transfer by abandonment. Here were three other companies besides the defendant to whom abandonment was made. What propriety is there in claiming that defendant was entitled to a bill of sale under the merchants' shipping act? See Phil. Ins. § 1722. It was held by Bramwell, L. J., and Brett, L. J., in the case of the *Union Bank of London v. Lenanton*, 3 C. P. Div. 243: s. c. 47 L. J. C. P. Div. 409, that a transfer of a ship which had not been registered as a British ship under section 19 of the merchants' shipping act of 1854 was good, although not made by bill of sale under section 55. No reference is made to the act in the policy, and as the contract of insurance was entered into in Buffalo, in the state of New York, I hardly see how it can be affected or controlled by the act of parliament above quoted.

Upon the third point I agree with the circuit judge, that the execution of the paper of date December 13, 1883, by Mr. Beatty, who was at the same time mortgagee, operated as a discharge of his mortgage by way of estoppel. The policy required the plaintiff's abandonment to be in writing, and that it should be efficient, if accepted, to convey to and vest in the insurance company an unincumbered and perfect title to the subject abandoned. The intention plainly appears, upon the face of the paper, to abandon, and Mr. Beatty, in executing the paper on behalf of the company, must have intended that such abandonment should be effectual, and that the insurance company would act upon it. When they did act upon it, and accept the abandonment, he was thereby precluded from ever afterwards asserting an interest in the

property antagonistic to that which was conveyed by the abandonment and acceptance : *Northwestern Transp. Co. v. Continental Ins. Co.* 24 Fed. Rep. 171 ; *Hayes v. Livingston*, 34 Mich. 387, and cases there cited ; *Pratt v. Maynard*, 116 Mass. 388 ; *Stafford v. Whitcomb*, 8 Allen, 518 ; *Roberts v. Crawford*, 54 N. H. 532 ; *Gage v. Whittier*, 17 N. H. 312 ; *Patrick v. Meserve*, 18 N. H. 300. He did, however, upon the trial, make out and tender a formal discharge of the mortgage for a nominal consideration, in confirmation of the abandonment. I do not see how this could affect the merits of the question under the terms of the policy, as the abandonment must have been efficient to convey an unincumbered title before it was accepted ; and while acceptance might be held to be a waiver of defects and irregularities in the abandonment, it could not be held to extend to a waiver of the right, secured by the contract, of an unincumbered title to the property, especially as the defendants were ignorant of the existence of such incumbrances until served with proofs of loss in 1884.

I think the abandonment was properly made and sufficiently proved. Was there an acceptance of the abandonment? Nothing was said by the defendants' agents or officers, either accepting or rejecting the abandonment made by the plaintiff. It is claimed, however, that under the facts and circumstances, by their acts in the premises subsequently to the abandonment, the defendants have accepted it. These acts consist in taking possession for the purpose of rescuing and retaining possession of the steamer, and neglecting to effect the rescue until about June, 1884, more than six months after the disaster, and then recovering her, and taking her to the port of Detroit, where the defendant neglected to cause repairs to be made, or to tender the amount found necessary by the survey to put her in repair. The plaintiff contends that it was the duty of the defendant, after taking possession for the purpose of recovering the vessel, to proceed with due diligence, and without unreasonable delay, to recover and repair the steamer, and that by reason of its negligence in that respect it has precluded itself

from denying that it has accepted the abandonment, and from its action and negligence acceptance will be inferred. On the contrary, the defendant's contention is that, by the terms of the contract between it and the plaintiff, "it was agreed that the acts of the insured or insurers, or their agents in recovering, saving and preserving the property insured in case of disaster, shall not be considered a waiver, or an acceptance of an abandonment, nor as affirming or denying any liability under this policy ; but such acts shall be considered as done for the benefit of all concerned, without prejudice to the rights of either party ; " and therefore nothing can be predicated upon the acts of the defendant in recovering and preserving the property insured, as affecting the question of acceptance of the abandonment, and that acceptance cannot be inferred, or implied from the silence of the company in reference to the abandonment.

This clause of the contract is for the benefit of all concerned. Its object doubtless is to do away with the rule of law formerly prevailing, which held that in case of abandonment, if the insurer interfered to recover or preserve the property, such act was an acceptance of the abandonment. It will be observed that this clause has reference to an abandonment previously made, and has no application to the efforts of either party before an abandonment is made. Whatever is done towards recovering a vessel lost by stranding, previous to abandonment, is done in the interest of the owner, and is governed by the same principles of salvage, whether done by the insurer or by other persons. No contract was necessary to protect the rights of parties in such case. It might happen, however, that while the insurer was engaged in an effort to rescue the vessel, the owner might give notice of abandonment, and then the insurer must, under the old rule, desist, at the peril of being held to have accepted the abandonment. Under the clause in question he runs no such risk, and may continue his exertions to rescue the property, and prosecute them to a successful termination, if possible. I do not think, however, that the privilege continues indefinitely, or to a case where the insurer,

after attempting a recovery, discontinues or suspends operations for the recovery of the vessel. It seems to me clear that the case would be different if, after notice of abandonment, and after suspension of previous efforts and considerable delay, the insurer proceeded to take possession of the property for the purpose of rescuing and recovering it. In the former case such acts are to be considered as having been done for the benefit of all concerned. In the latter case, as well as where he proceeds for the first time to recover the property after abandonment, such acts would signify an acceptance of the abandonment, and that the insurer was acting in the character of owner; and especially would this be so when the insurer had preserved silence in reference to the abandonment, and had neither denied the right to abandon or given notice of a refusal to accept. The rights of the respective parties, as well as good faith and fair dealing, requires such construction to be placed upon the contract: *Kaltenbach v. Mackenzie*, 3 C. P. Div. 479, 480, per Colton, L. J. The owner, from the time a legal abandonment is made, ceases to have any right or interest in the property, which then becomes vested in the insurer ; and while it remains incumbent upon the insured to show the facts which gave him the right to abandon he may relieve himself from that burden by showing acceptance, either express or implied, by the insurer. Whatever was done by the defendant in November, 1883, in attempting the rescue of the steamer Manitoba has no bearing upon the question of abandonment, under this clause of the policy, because no abandonment was attempted by the owner until those efforts were suspended, and had virtually ceased. Afterwards came the notice of December 13, 1883, to which the defendant returned no reply. Nothing was done until the following May, when the defendant sent Mr. Murphy to the scene of the disaster, who recovered the steamer, and brought her to the port of Detroit about the first of June, 1884. Now, in what capacity was the defendant acting when it sent Murphy to recover the steamer, and bring her to Detroit? Was it acting as owner, or merely as salvor for the benefit of all

concerned? The intent with which it acted has much to do with the question of acceptance: *Reynolds v. Ocean Insurance Co.* 22 Pick. 191.

If it intended to act as owner, it was an acceptance; but if it merely intended to rescue the steamer, and cause her to be repaired, and thus indemnify the owners, it would not be an acceptance, and the plaintiff would be obliged to prove facts which entitled it to abandon, before it could recover for a constructive total loss; so that the act in itself may be said to be ambiguous, and in such a case, looking to this act merely as evidence of abandonment, I think the jury would have the right to construe the act most strongly against the defendant, for the reason that its interest was a matter entirely within its own knowledge, and by speaking it had the power to solve all doubts and dispel all ambiguities, and, although no duty rested upon it to say whether it accepted the abandonment or not, so long as it was both silent and inactive, yet, when it did act, its duty was to say for what purpose, and with what intent it proposed to act. *Peele v. Merchants' Ins. Co.*, 3 Mason, 27; *Cincinnati Ins. Co. v. Bakewell*, 4 B. Mon. 541; *Provincial Ins. Co. v. Leduc*, L. R. 6 P. C. 224: s. c. 11 Eng. Rep. 84.

Taking what has been said on the subject of acceptance in connection with the facts tending to show the negligence of the defendant in not repairing the steamer in a reasonable time, or tendering the money found necessary by the surveyors to put her in repair, less one-third new for old, the acceptance was fully made out, and justified the verdict which the jury gave. *Copelin v. Insurance Co.*, 9 Wall. 461; *Peel v. Suffolk Ins. Co.*, 7 Pick. 254; *Reynolds v. Ocean Ins. Co.*, 1 Metc. 160; *Reynolds v. Ocean Ins. Co.*, 22 Pick. 191; *Norton v. Lexington, etc., Ins. Co.*, 16 Ill. 235; *Marmaud v. Melledge*, 123 Mass. 176.

The defendant, however, contends that the rule recognized by the authorities above cited is modified, and in fact annulled, by the express language of the policy, which provides as follows:

" In case of loss or misfortune it shall be lawful and neces-

sary to and for the assured, its agents, factors, servants, and assigns, to give the assurers prompt notice of the disaster, and submit the plan adopted for recovering and saving the property, and to make all reasonable exertion in and about the defense, safeguard, and recovery of the said vessel, or any part thereof, without prejudice to this insurance; and after recovery, and the holding of a survey, by persons chosen by the insurers and insured, or their agents, made under oath, setting forth the particulars of actual damage received by the vessel in the disaster, and discriminating between those and former defects, and wear and tear, the insured are to cause the same to be forthwith repaired in accordance with the surveyor's specifications; and in case of neglect or refusal on the part of the insured, its agents or assigns, to adopt prompt and efficient measures for the safeguard and recovery thereof, or to repair the same when recovered, then the said insurers may, and are hereby authorized to, interpose and recover the said vessel, or after recovery to cause the same to be repaired, or both, for account of the insured."

The defendant claims that, under this clause of the policy, it could interpose to rescue the steamer on account of the neglect of the owner so to do, and after recovery, it was under no duty or obligation to repair, but could tender her back to her owner in her wrecked and damaged condition. I cannot accede to this view.  The policies under which decisions have been made holding it to be the duty of the underwriter, when he takes possession and recovers a stranded vessel, to proceed with due diligence, and put her in repair, contained a clause somewhat different from the above, and substantially as follows:

"In case of the neglect or refusal of the insured to adopt prompt and efficient measures for the safeguard and recovery thereof, and to repair the same when recovered, then the insurers may, and are hereby authorized to recover the said vessel, and cause her to be repaired for account of the insured."

What change has been made in the legal effect of this clause by the difference in phraseology, as indicated in the extract above quoted, from the policy in question?  It has this extent, and no more: that if, after the insured recovers the vessel, he neglects or refuses to proceed to cause it to be

repaired, the insurer may interpose, and do so for account of the insured. The object is that the survey may not be deemed conclusive, or that with other proof, upon the question of damage; but in order to ascertain the extent of the loss, the insured may cause the vessel to be repaired for the purpose of ascertaining the extent of his liability. But the clause only applies where the insured recovers the vessel, and then neglects or refuses to cause her to be repaired; and when the insured neglects or refuses to recover the vessel, and the insurer interposes and recovers her, he must, as before *do both.* He must recover and cause to be repaired. There is no clause in the policy, which authorizes, nor can it by any reasonable construction be made to authorize, the insurer to rescue the vessel and restore it to the owner in a wrecked or damaged condition. The whole sentence (and indeed the whole policy) must be read and construed together. What the insurer is authorized to do depends upon the neglect or refusal of the insured to perform the duties enjoined by that clause. These are to adopt prompt and efficient measures for the safeguard and recovery of the vessel, and to repair the same when recovered. The insurer is authorized to interpose, after recovery, to cause the same to be repaired. After recovery by whom? This evidently refers to the neglect of the insured, after recovery by him, to cause repairs to be made, and not to the neglect of the company, after recovery by it, to cause repairs to be made. In the latter case the insurer having interposed to recover the property, and having it in its possession, no new or further interposition is required by the policy, but the duty is imposed, from the interposition to recover, to proceed with due diligence, and cause the vessel to be repaired. This being the proper construction of the policy, the neglect of the defendant to cause the repairs to be made was evidence upon which the jury were at liberty to find an acceptance by the defendant of the abandonment.

This conclusion renders a decision of the other questions involved unnecessary. The judgment is affirmed.

The other Justices concurred.