THE RICHELIEU & ONTARIO NAVIGATION COMPANY V.
THE THAMES & MERSEY MARINE INSUR-
ANCE COMPANY.

[See 58 Mich. 132.]

*Marine insurance—Abandonment—Notice—Acceptance—Liability of
insurer.*

1. An abandonment once made and accepted fixes the rights of the
parties, and renders the insurers liable as for a total loss.

2. Where, upon receiving notice of the abandonment of a vessel by
the owners, the insurers take her in charge, put her in the dry-
dock, and cause her to be repaired at an expense exceeding one-
half of her value, and do not return, or offer to return, the
vessel to the owners, these acts amount to an acceptance, and
the title passes to the insurers.

3. On receiving notice of abandonment, the insurers have a right to
refuse acceptance until they make inquiry into the cause of the
accident, and if it was occasioned by any peril not insured
against, or by neglect of parties having the vessel in charge for
the owners, or because of her unseaworthiness, or of other
causes excepted in the policy, their liability will not attach; but
they cannot accept the vessel and defer these inquiries until
after suit is brought, and then for the first time set up a claim
that their acceptance is not conclu-

4. A notice that an insured vessel is ashore at a stated place, and
that the owners abandon the boat and claim a total loss, with
request to the agent to whom the notice is directed to inform
the underwriters, is a sufficient notice of abandonment.

5. By the well-established principles of marine insurance a deed of
abandonment is not essential to the rights of either party, as the
title passes, and the property vests in the insurer, immediately
on abandonment. No particular form of notice is necessary, and,
unless required by the policy, it need not be in writing. *Trans.
Co. v. Ins. Co.*, 59 Mich. 228, 229.

Error to Wayne. (Reilly, J.) Argued June 20, 1888.
Decided November 28, 1888.

*Assumpsit* on marine insurance policy. Defendant

brings error. Affirmed. The facts are stated in the opinion.

*Maynard & Swan,* for appellant, contended:

1. The telegram states no cause for abandonment. This it must do; citing *Bullard v. Ins. Co.,* 1 Curt. C. C. 148; *McConochie v. Ins. Co.,* 26 N. Y. 477.

2. As to when the right to abandon arises, counsel cited 2 Pars. Mar. Ins. 181, 182, 584; *Bosley v. Ins. Co.,* 3 Gill & J. 450; *Wood v. Ins. Co.,* 6 Mass. 479; *Patrick v. Ins. Co.,* 11 Johns. 9; *Kaltenbach v. Mackenzie,* L. R. 3 C. P. Div. 476.

3. The secretary of a corporation has not, as such, the authority to abandon, and no person can do so who has not the power to make a legal transfer of the property; citing 2 Pars. Mar. Ins. 119.

4. The defendant's agents had the right to send and pay for the expedition which rescued the vessel, without running the risk of being held to have accepted the abandonment; citing *Trans. Co. v. Ins. Co.,* 59 Mich. 232.

5. The agent's statements or assumptions are not evidence of the existence of his authority; citing *Kornemann v. Monaghan,* 24 Mich. 36; *Reynolds v. Ins. Co.,* 36 Id. 131, 141; *Hirshfield v. Waldron,* 54 Id. 651.

6. While, as a rule, acceptance of an abandonment is irrevocable, this is true only when it is made with knowledge of the facts; citing 2 Pars. Mar. Ins. 349, 350; even though one party led the other into mistake, without fraud; citing 2 Phil. Ins. § 1817; and an adjustment is not binding if in any degree it proceeds on mistake; citing *Steel v. Lacy,* 3 Taunt. 285; *Faugier v. Hallett,* 2 Johns. Cas. 233; *Reyner v. Hall,* 4 Taunt. 725; *Stuart v. Sears,* 119 Mass. 145; and the insurer may even pay the loss, yet if he does this under mistake, and without knowledge of the facts which would defeat the claim of the insured under the policy, his right to recover the amount from the insured is clear; citing *Johnson v. Ins. Co.,* 39 Mich. 33; 2 Phil. Ins. § 997; *DeHahn v. Hartley,* 1 Term Rep. 343; *Ins. Co. v. Walsh,* 18 Mo. 229.

*Moore v. Canfield,* for plaintiff, contended:

1. This notice of abandonment was held sufficient on the former hearing.

2. The record shows a constructive acceptance of the abandonment by the defendant, and it is therefore liable to pay as for a total loss without regard to the extent of the damages suffered by the steamer, or whether the loss was occasioned by a peril insured

against; citing 2 Phil. Ins. 391, 392, 394, 400; 2 Pars. Mar. Ins. 177; 2 Arnould, Ins. 993, 1057, 1185; 2 Greenl. Ev. § 392; Barber, Ins. § 144; and acceptance may be implied from the acts of underwriters; citing 2 Phil. Ins. § 1692; *Badger v. Ins. Co*, 23 Pick. 355; *Peele v. Ins. Co.*, 3 Mason, 81; *Pcele v. Ins. Co.*, 7 Pick. 254; *Reynolds v. Ins. Co.*, 22 Id 191; 2 Arnould, Ins. 1174; *Trans. Co. v. Ins. Co.*, 59 Mich. 214; *Copelin v. Ins. Co.*, 9 Wall. 461; *Norton v. Ins. Co.*, 16 Ill. 235; *Ins. Co. v. Bakewell*, 4 B. Mon. 541; *Trans. Co. v. Ins. Co.*, 24 Fed. Rep. 171; *Copelin v. Ins. Co.*, 46 Mo. 211; *Marmaud v. Melledge*, 123 Mass. 173.

LONG, J.    This is an action of *assumpsit* on a policy of marine insurance.    The case has been once heard in this Court, and is reported in 58 Mich. 132 (24 N. W. Rep. 547).

On the former trial the defendant in the court below based its defense simply upon the ground that no action could be maintained by the plaintiff, because the policy declared that it was issued "on account of the Owen Sound Steam-ship Company," and the circuit court so ruled, and a judgment was entered in favor of the defendant, which was reversed by this Court, and the case remanded for new trial.    In the present trial the plaintiff had a verdict and judgment for the full amount of its claim, and the defendant brings the case into this Court by writ of error.

On the trial it appeared that the plaintiff was the owner of the steamer Spartan, and in the spring of 1883 she was chartered for the period of three years to the Owen Sound Steam-ship Company, one of the terms of the agreement being that the charterers should keep the steamer insured for the benefit of the owner.    Under this agreement the charterers caused her to be insured in several companies, among whom was the defendant, who issued a policy in the sum of $7,500, dated April 21, 1883, and under which it insured the steamer against the perils of the Great Lakes and other connecting waters, from May 1 to November 30, 1883.

Under the charter, the Owen Sound Steam-ship Company assumed the exclusive possession of the steamer, and appointed or hired her officers and crew. The policy, in terms, was issued—

" On account of the Owen Sound Steam-ship Company; loss, if any, payable to the Richelieu & Ontario Navigation Company."

Soon after taking possession of the steamer, at Lachine, near Montreal, the charterers brought her to Owen Sound, and put her upon their regular route between that port and Fort William, on the north shore of Lake Superior. After having made three trips on this route, the steamer, while on a voyage from Fort William to Owen Sound, was stranded, in the night-time, upon a reef near Caribou island, in Lake Superior.

Upon receiving notice of the disaster, and believing that the steamer was likely to prove a total loss, the owner gave notice of abandonment to the defendant, who sent a wrecking expedition to her relief, and succeeded in getting her off, and brought her to Detroit, a port foreign to her owner, where she was repaired.

The valuation of the steamer, as stated in the policy, was $50,000. The limit of insurance was $40,000. The policy further provided:

" Touching the adventures and perils which the said insurance company are content to bear and take upon themselves by this policy, they are of the lakes, rivers, canals, fires, jettisons, that shall come to the damage of said vessel, or any part thereof, excepting all perils, losses, misfortunes, or expenses consequent upon and arising from or caused by the following or other legally excluded causes, viz.:

" Damage that may be done by the vessel hereby insured to any other vessel or property; incompetency of the master; or insufficiency of the crew, or want of ordinary care and skill in navigating said vessel, and in loading, stowing, and securing the cargo of said vessel; rottenness,

inherent defects, overloading, and all other unseaworthiness; theft, barratry, or robbery; charges, damages, or loss in consequence of a seizure or detention for or on account of any illicit or prohibited trade, or any trade in articles contraband of war; any claim for wages or provisions furnished to officers or crew while the property insured may be detained by any disaster or during subsequent repairs, excepting, always, services rendered in protecting, recovering, and securing the vessel or property covered by this policy," etc.

The policy also contains the following provision:

"It is agreed that the acts of the insured or the insurers, or their agents, in recovering, saving, and preserving the property insured in case of disaster, shall not be considered a waiver or an acceptance of an abandonment, nor as affirming or denying any liability under this policy, but such acts shall be considered as done for the benefit of all concerned, and without prejudice to the rights of either party.

"Further, the insured shall not have a right to abandon the vessel in any case unless the amount which the insurers would be liable to pay under an adjustment as of a partial loss shall exceed half the amount insured, nor shall detention by the season or by any other cause be alleged or allowed as cause for abandonment. Moreover, no abandonment, in any case whatever, and even when the right to abandon may exist, shall be held or allowed as effectual or valid unless it shall be in writing, signed by the insured, and delivered to the said company or to their authorized agent, nor unless it shall be efficient, if accepted, to convey to and to vest in said insurance company an unincumbered and perfect title to the subject abandoned," etc.

Upon the trial the plaintiff, to maintain the issue upon its part, introduced in evidence the policy of insurance declared upon, and offered proofs tending to show that plaintiff was a Canadian corporation, and owner of the steamer Spartan, described in the policy. For the purpose of showing the abandonment claimed plaintiff introduced in evidence the following telegram:

MONTREAL, June 26, 1883.

"To CHARLES PERRY, Insurance Agent: Spartan ashore on Caribou island, and this company begs to inform you that they abandon the boat, and claim total loss. Please inform the underwriters.

"J. N. BEAUDRY,

"Secretary R. &. O. Nav. Co."

Plaintiff also introduced in evidence, in connection with such telegram, the following letter written by Charles Perry to Crosby & Dimick, the general agents of defendant at Buffalo, N. Y., and which letter inclosed such telegram to them:

"MONTREAL, June 26, 1883.

"CROSBY & DIMICK,

"Buffalo, N. Y.

"Gentlemen: The enclosed message received from Montreal in re Spartan. I think they are rather premature, as no word has been received from the steamer as to her position.

"Yours truly,

"CHARLES PERRY.

"P. S. Since writing the foregoing I have seen a letter just received from Owen Sound. One of the men from the Spartan came down by steamer this morning to the Sault, and reports that the damage done to the Spartan is not, so far as could be seen, of a serious character. She is stranded on the south-west corner of the shoal. In running on she broke her suction-pipe in doing so, which, as a matter of course, allowed her to fill with water. She has about eight feet of water in the hold, and stood the storm very well. The passengers remain on board. She don't seem to pound on the bottom, and expect that the tugs Winslow and Leviathan have her off before this."

Plaintiff read the testimony of Charles Perry, who signed the foregoing letter, and who testified substantially that he lived at Toronto, and secured the policy sued on from Crosby & Dimick, defendant's general agents; that he was not the agent of defendant, but made the application for the insurance, and sent it to Buffalo; that

Elliott, of the Owen Sound Steam-ship Company, asked for the insurance, and witness was paid for his services in obtaining the risk by the general agents of defendant, Crosby & Dimick, and that he insured the vessel with Crosby & Dimick, from whom he received the policy; that witness' name was indorsed on the policy when he received it as "Charles Perry, Agent," and was written in Crosby & Dimick's office, as was also the policy; that he asked Elliott to insure the vessel, and had authority from Crosby & Dimick to solicit insurance for defendant.

Plaintiffs also called Stephen B. Grummond as a witness, who testified that he was the owner of the tug Winslow, and was in 1883, and that he sent that tug under command of Capt. Swain, in June, 1883, with a wrecking outfit, to rescue the steamer Spartan; that he was employed by Crosby & Dimick, defendant's agents, to send the expedition, and knew of the Winslow bringing the Spartan to Detroit; that Crosby & Dimick paid him for the Winslow's services in rescuing the Spartan.

Martin Swain testified that he commanded the tug Winslow, and in June, 1883, rescued the Spartan from the west shore of Caribou island, and brought her to Detroit, and turned her over to the Detroit Dry-dock Company.

Alexander McVittie testified in behalf of plaintiff that he was, in 1883, secretary of the Detroit Dry-dock Company; that that company did work on the steamer Spartan in the summer of 1883; that he had a conversation with Capt. Crosby, of the firm of Crosby & Dimick, in regard to repairing the Spartan; that Crosby wanted the dry-dock company to make a bid for repairing the Spartan for a specific sum, which it declined to do; that the company did not make any arrangements for doing the work;

that Crosby wanted a first-class job, and the work done right; that the dry-dock company did the work, and Mr. Gibson, of Buffalo, was the general superintendent; and that the dry-dock company got its pay for the work out of the district court in admiralty.

Plaintiff then called Samuel Gibson as a witness, who testified substantially that he resided in Buffalo, and is a ship-builder; that, in July, 1883, Lorenzo Dimick, of the firm of Crosby & Dimick, of Buffalo, sent for him, and asked if he would go to Detroit and hold a survey on a vessel, which was then in a dry-dock. of Detroit, meaning the Spartan.

"He said he had received a notice of this boat being abandoned to the insurers, and wanted me to go up and see how badly she was used up, and I started that night for Detroit."

Witness further testified that he held a survey with Frank E. Kirby; that he saw the captain, and told him he came up to represent the insurance companies in making survey, and that he did represent the insurers; that after the survey he negotiated with Kirby, of the Detroit Dry-dock Company, with regard to the repairs of the Spartan, and agreed upon the work to be done and the materials to be furnished, but not upon the price; that he wanted Kirby to take the contract to repair the steamer; that Kirby would not do the work by contract, but offered to do it by day's work; that he saw Crosby three days after the survey at the dry-dock. The matter of repairing the Spartan was then talked over by Crosby, Kirby, McVittie, and the foreman of the yard. Witness then told Crosby that Kirby and he could not agree, and Crosby told witness to go along as best he could with surveying and repairing the Spartan; to use his own judgment. Crosby said:

"We will have to repair it. If we don't do it by the job we have got to do it by the day. That she would have to be gotten out of the dry-dock, or they would charge us like Sam Hill."

Witness was then asked:

"Q. What did Crosby say to you about making arrangements with the dry-dock company about day work?

"A. He said: 'Go ahead. Do the best you can.' He left the whole business with me. Crosby told me to do it any way, and said, 'The boat is all broken up, and I have got to do something with it.'"

Witness, continuing, said:

"I arranged with Kirby to do the work by the day. I returned to Buffalo, and saw Dimick. I told Dimick that the dry-dock company would not take the contract; that the boat was all stripped. The bottom I started by the day's work. He said: 'All right. I want to hire you. What will you charge to go up there and look after the work? Those people will have a fair bill against us,'—or something to that effect. He wanted to have somebody to watch it. I made a bargain with Dimick to superintend the repairs, and superintended the work most of the time, reporting to Crosby and Dimick every week. * * * I told Dimick the cost of repairs would exceed the survey. I think I put a price of $15,000 on all the work on the survey, or $18,000. Kirby would not agree to that. I told Dimick the cost would exceed $6,000 or $7,000 more than the survey. Dimick got mad and damned the boat, and then said: 'You have got to get along, and get it done. She has got to be fixed.'"

Plaintiff then gave evidence tending to show that there was no person present during the time the repairs were going on authorized to represent the owner in making repairs. Plaintiff then rested its case.

Counsel for defendant then offered in evidence the proofs of loss and protest, for the purpose of showing how the loss occurred, and in connection therewith offered to show—

1. That the Spartan was lost by reason of perils not insured against.

2. That the vessel was lost by unseaworthiness.

3. That she was lost by want of ordinary care and skill in her navigation, in that she was run in violation of the laws of Canada; that she should run at a moderate rate of speed in a fog; she was run without a lookout, and without soundings being taken; and generally to show the conditions under which that loss was caused.

The court ruled that, as the plaintiff had rested the case entirely upon the acceptance of the abandonment of the vessel, the defendant, before showing the conditions under which the loss was caused, should first produce some evidence tending to negative the acceptance of the abandonment. Some proofs were so offered, and the defendant was then permitted to show the manner in which it claimed the disaster happened.

Proofs were offered by plaintiff in rebuttal of defendant's theory of the cause of the disaster, but plaintiff insisted, and now insists, that the proofs show an abandonment to defendant as a total loss and an acceptance thereof by it. Upon this question the court charged the jury as follows:

"Upon the first question, was there an abandonment and acceptance of the same by the defendant? I charge you that, if you believe from the evidence in this case that defendant received notice of the abandonment from plaintiff,—and upon that point there can be no dispute among you, because notice of the abandonment was sent to the defendant,—and thereafter they got the steamer off, and brought her to Detroit, and caused her to be repaired without consulting the plaintiff, and failed to tender her back to the plaintiff, or any one representing it, then this would amount to a constructive acceptance of the abandonment, and plaintiff is entitled to recover, irrespective of what the cause of the stranding was."

The court further instructed the jury as follows:

"As aiding your judgment, evidence has been submitted to you as to the stranding of the steamer Spartan and her course at the time of the accident, as to the condition of the weather, the rate of speed at which she was

going, the manner in which she was officered and equipped, and the kind of a compass she carried, the length of time she had carried this compass, other trips she had made with this compass, a general description of the steamer, and the trade she was in. The plaintiff contends that the steamer was lost by stranding accidentally on Caribou island, on June 19, 1883. Defendant claims that the stranding and consequent loss was attributable to the negligence of the master and the unseaworthiness of the steamer.

"These are questions for you to consider and determine between the parties. I cannot say to you as a matter of law that the speed of the steamer at the time of the accident was negligence, or that the absence of a lookout was in itself negligence, or that the condition of the compass showed negligence. I leave those to you to determine from all the evidence in the case. You have heard the testimony as to the length of time the compass had been in use, the trips that had been made with it, the manner in which it acted, and the opinion of experts as to the compass, and the opinion of experts as to the other facts,—the running of the steamboat in this weather, and as to the lookout. From this evidence, and all the evidence in the case, you are to determine whether the steamer was lost through the negligence of those navigating her, or her unseaworthiness, and, if she was, the plaintiff cannot recover, and your verdict should be for the defendant.

"But if you find that she was seaworthy when she started upon the voyage upon which she was lost, and that she was not lost through the negligence of those in charge of her, your verdict should be for the plaintiff.

"Defendant has asked me to charge you that, if the defendant or its agent had no information of the fact that the Spartan was running at full speed in a dense fog, and without a lookout, when she was stranded, defendant did not waive its right to contest the liability for a loss by efforts to ascertain the extent of the damage, or even by giving orders to repair the same, if it did so, believing the loss was caused by a peril insured against; nor did the insurer, by such efforts or orders, in ignorance of the cause of the loss, irrevocably accept the alleged abandonment of said steamer. That I will give you with these modifications:

"If you believe that the conduct of the defendant— and when I say defendant I mean the firm of Crosby & Dimick, its general agents—amounted to an acceptance of the abandonment, and if they took charge of the repairs, and had them done, and failed to return her, that was an acceptance; but if they afterwards learned the facts just referred to in this request, and determined to contest their liability upon the ground of negligence and unseaworthiness, then they should have so notified the plaintiff, and not have allowed the plaintiff to rest under the supposition that the abandonment was accepted. If you believe, after learning these facts, they remained quiet, giving the plaintiff no notice, so the plaintiff might have taken steps to have the steamer repaired or not, as it thought best, the defendant did waive its right to contest the liability upon the ground of negligence and unseaworthiness.

"As I have stated, plaintiff seeks to recover, first, upon the ground of an abandonment of the vessel to the insurer, and the acceptance of the same by the defendant. If you find that, it will not be necessary for you to determine whether the damage to the vessel exceeded 50 per cent. of the cost. If it did exceed 50 per cent. of the cost, then the plaintiff had the right to abandon the steamer as a constructive total loss. Therefore, if you do not find for the plaintiff on the first proposition, it will be necessary for you to determine before you reach the second consideration whether the vessel was lost by stranding, and whether the damage to the vessel amounted to 50 per cent. of her value. If it did not amount to 50 per cent. of her value, then the plaintiff is not entitled to claim her as a constructive total loss."

At the close of the charge, the court, at the request of the plaintiff, submitted the following special questions to the jury:

"1. Did the owners of the Spartan, after she was stranded, abandon her to the insurers?

"A. Yes.

"2. Did the insurers, after receiving notice of the abandonment, get her off, and bring her to Detroit?

"A. Yes.

"3. Did the insurers, after the Spartan was placed in dry-dock, cause her to be repaired?

"A. Yes.

"4. Did the insurers, after the repairs were made, return the Spartan to her owners, or offer to do so?

"*A*. No."

Defendant's counsel requested the court to submit the following special questions to the jury for their finding:

"1. Was the Spartan stranded while running at full speed, without a lookout, in a dense fog?

"2. Is a steamer on Lake Superior, running 12 miles an hour, without a lookout, in a dense fog, navigated with ordinary care and skill?

"3. Would not ordinary care and skill, and a good compass, have enabled the Spartan to clear Caribou island?

"4. Did Captain Crosby, in directing strict supervision to be kept of the repairs put on the steamer, intend to accept an abandonment of the Spartan?

"5. Did not Captain McGregor order Captain Swain to take the Spartan to Detroit for repairs? And was she not put in dry-dock by Captain McGregor's orders?"

These special questions of defendant's the court refused to submit to the jury, except the first, upon which the court remarked:

"There is no evidence that this vessel had a lookout in the sense of its being the duty of one particular man on the vessel to keep a lookout. The evidence tends to show that the man on watch, the captain or mate, acted as lookout. In the captain's watch it was the second mate. The officer of the deck had charge of the vessel, and acted as lookout; but there is no evidence in the case that there was a special officer whose duty it was to act as lookout, and I suppose you should answer that question in accordance with the testimony in the case, that there was no special lookout other than the mate.  *  *  * I will refuse the balance of the questions."

The jury returned no answer to this special question. Verdict and judgment passed for the plaintiff for the full amount of insurance claimed. Defendant removes the case to this Court by writ of error.

Ninety-nine errors are assigned. It would be fruitless for us to take up and discuss these several assignments

of error, except in a general way. We have carefully read the testimony, the claims made by the respective parties, the charge of the court, and the findings of the jury, and from the whole record we are of the opinion that the verdict and judgment must stand. The charge of the court is more favorable to the defendant than we think it entitled to. The jury have found specifically that the owners abandoned the steamer to the insurers; that, after receiving notice of the abandonment, the insurers got her off, and brought her to Detroit; that they placed her in dry-dock, and caused her to be repaired; and that they did not return, or offer to return, her to the owners.

It is claimed, however, by defendant that, admitting all these facts to be proven, yet, if it was done in ignorance on the part of the insurers as to cause of the loss, and believing that the loss was occasioned by one of the perils insured against, when in fact the loss was occasioned by perils not insured against, which facts did not come to the attention of the insurers until after the repairs were made, and acceptance of abandonment under such circumstances would not be conclusive upon the defendant, and it would have a right to open the whole controversy, and inquire into the cause of the loss; and if it did occur by perils not insured against, or by the negligence of the parties having her in charge, or by unseaworthiness, these facts would defeat the plaintiff's right of recovery.

We cannot agree with the counsel in this view. An abandonment once made and accepted fixes the rights of the parties, and renders the insurers liable as for a total loss. Here was written notice, signed by the owners, that they abandon her to the insurers. It is received by the insurers. They act upon it, take the vessel in charge, put her in dry-dock, cause her to be repaired at great

expense, and retain possession. They do not return, or offer to return, her to the owners. These acts amount to an acceptance. The title of the vessel passes to the insurers under such circumstances. The insurers had the right to refuse acceptance until they made inquiry into the cause of the accident, and if it was occasioned by any peril not insured against, or by the neglect of parties having her in charge for the owners, or her unseaworthiness, or other causes excepted in the policy, and if these facts were found to exist, liability would not attach; but it cannot be said that the insurers may do all the acts found to have been done by them in this case, without inquiry as to the cause of the accident, make repairs to an amount exceeding 50 per cent. of the value of the vessel, fail to return her, and make no offer of return, and, when an action is brought upon the policy, then for the first time set up a claim that the acceptance is not conclusive, and be permitted to make the inquiries as to the cause of the accident they should have made before performing all these acts, which amount to an acceptance.

It was held by this Court on the former hearing that the form of the notice of abandonment was sufficient. 58 Mich. 132 (24 N. W. Rep. 547).

In *Northwestern Trans. Co. v. Ins. Co.*, 59 Mich. 228, 229 (26 N. W. Rep. 336), this Court said:

" By the well-established principles of marine insurance a deed of abandonment is not essential to the rights of either party, as the title passes, and the property vests in the insurer, immediately on abandonment. No particular form is necessary, and, unless required by the policy, it need not be in writing."

The record shows that the notice of abandonment was not only received, but was acted on by the insurance company without objection, and they cannot now be

heard to complain as to its form or sufficiency. We think there was sufficient evidence to go to the jury of an acceptance of the abandonment, and that there was an acceptance by the acts of the defendant, and it is too late for it to recede. It became the owner because of the acceptance, and is therefore liable as for a total loss. We need not discuss the other questions, as this must be conclusive of the rights of the parties.

The judgment of the court below must be affirmed, with costs.

The other Justices concurred.